(Slip Opinion) OCTOBER TERM, 2014 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## YOUNG *v.* UNITED PARCEL SERVICE, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 12–1226.   Argued December 3, 2014—Decided March 25, 2015

The Pregnancy Discrimination Act added new language to the definitions subsection of Title VII of the Civil Rights Act of 1964. The first clause of the Pregnancy Discrimination Act specifies that Title VII's prohibition against sex discrimination applies to discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U. S. C §2000e(k). The Act's second clause says that employers must treat "women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Ibid.* This case asks the Court to determine how the latter provision applies in the context of an employer's policy that accommodates many, but not all, workers with nonpregnancy-related disabilities.

Petitioner Young was a part-time driver for respondent United Parcel Service (UPS). When she became pregnant, her doctor advised her that she should not lift more than 20 pounds. UPS, however, required drivers like Young to be able to lift up to 70 pounds. UPS told Young that she could not work while under a lifting restriction. Young subsequently filed this federal lawsuit, claiming that UPS acted unlawfully in refusing to accommodate her pregnancy-related lifting restriction. She brought only a disparate-treatment claim of discrimination, which a plaintiff can prove either by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or by using the burden-shifting framework set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792. Under that framework, the plaintiff has "the initial burden" of "establishing a prima facie case" of discrimination. *Id.,* at 802. If she carries her burden, the employer must have an opportunity "to articulate some legitimate, non-discriminatory reason[s] for" the difference in treat-

ment. *Ibid.* If the employer articulates such reasons, the plaintiff then has "an opportunity to prove by a preponderance of the evidence that the reasons . . . were a pretext for discrimination." *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248, 253.

After discovery, UPS sought summary judgment. In reply, Young presented several favorable facts that she believed she could prove. In particular, she pointed to UPS policies that accommodated workers who were injured on the job, had disabilities covered by the Americans with Disabilities Act of 1990 (ADA), or had lost Department of Transportation (DOT) certifications. Pursuant to these policies, Young contended, UPS had accommodated several individuals whose disabilities created work restrictions similar to hers. She argued that these policies showed that UPS discriminated against its pregnant employees because it had a light-duty-for-injury policy for numerous "other persons," but not for pregnant workers. UPS responded that, since Young did not fall within the on-the-job injury, ADA, or DOT categories, it had not discriminated against Young on the basis of pregnancy, but had treated her just as it treated all "other" relevant "persons."

The District Court granted UPS summary judgment, concluding, *inter alia,* that Young could not make out a prima facie case of discrimination under *McDonnell Douglas.* The court found that those with whom Young had compared herself—those falling within the on-the-job, DOT, or ADA categories—were too different to qualify as "similarly situated comparator[s]." The Fourth Circuit affirmed.

Held:

1. An individual pregnant worker who seeks to show disparate treatment through indirect evidence may do so through application of the *McDonnell Douglas* framework. Pp. 10–23.

(a) The parties' interpretations of the Pregnancy Discrimination Act's second clause are unpersuasive. Pp. 12–20.

(i) Young claims that as long as "an employer accommodates only a subset of workers with disabling conditions," "pregnant workers who are similar in the ability to work [must] receive the same treatment even if still other nonpregnant workers do not receive accommodations." Brief for Petitioner 28. Her reading proves too much. The Court doubts that Congress intended to grant pregnant workers an unconditional "most-favored-nation" status, such that employers who provide one or two workers with an accommodation must provide similar accommodations to *all* pregnant workers, irrespective of any other criteria. After all, the second clause of the Act, when referring to nonpregnant persons with similar disabilities, uses the open-ended term "other persons." It does not say that the employer must treat pregnant employees the "same" as "*any* other per-

sons" who are similar in their ability or inability to work, nor does it specify the particular "other persons" Congress had in mind as appropriate comparators for pregnant workers. Moreover, disparate-treatment law normally allows an employer to implement policies that are not intended to harm members of a protected class, even if their implementation sometimes harms those members, as long as the employer has a legitimate, nondiscriminatory, nonpretextual reason for doing so. See, *e.g., Burdine*, *supra,* at 252–258. There is no reason to think Congress intended its language in the Pregnancy Discrimination Act to deviate from that approach. Pp. 12–14.

(ii) The Solicitor General argues that the Court should give special, if not controlling, weight to a 2014 Equal Employment Opportunity Commission guideline concerning the application of Title VII and the ADA to pregnant employees. But that guideline lacks the timing, "consistency," and "thoroughness" of "consideration" necessary to "give it power to persuade." *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140. The guideline was promulgated after certiorari was granted here; it takes a position on which previous EEOC guidelines were silent; it is inconsistent with positions long advocated by the Government; and the EEOC does not explain the basis for its latest guidance. Pp. 14–17.

(iii) UPS claims that the Act's second clause simply defines sex discrimination to include pregnancy discrimination. But that cannot be right, as the first clause of the Act accomplishes that objective. Reading the Act's second clause as UPS proposes would thus render the first clause superfluous. It would also fail to carry out a key congressional objective in passing the Act. The Act was intended to overturn the holding and the reasoning of *General Elec. Co.* v. *Gilbert*, 429 U. S. 125, which upheld against a Title VII challenge a company plan that provided nonoccupational sickness and accident benefits to all employees but did not provide disability-benefit payments for any absence due to pregnancy. Pp. 17–20.

(b) An individual pregnant worker who seeks to show disparate treatment may make out a prima facie case under the *McDonnell Douglas* framework by showing that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others "similar in their ability or inability to work." The employer may then seek to justify its refusal to accommodate the plaintiff by relying on "legitimate, nondiscriminatory" reasons for denying accommodation. That reason normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those whom the employer accommodates. If the employer offers a "legitimate, nondiscriminatory" reason, the plaintiff may show that it

is in fact pretextual. The plaintiff may reach a jury on this issue by providing sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's "legitimate, nondiscriminatory" reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden imposed—give rise to an inference of intentional discrimination. The plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers. This approach is consistent with the longstanding rule that a plaintiff can use circumstantial proof to rebut an employer's apparently legitimate, nondiscriminatory reasons, see *Burdine*, *supra*, at 255, n. 10, and with Congress' intent to overrule *Gilbert*. Pp. 20–23.

2. Under this interpretation of the Act, the Fourth Circuit's judgment must be vacated. Summary judgment is appropriate when there is "no genuine dispute as to any material fact." Fed. Rule Civ. Proc. 56(a). The record here shows that Young created a genuine dispute as to whether UPS provided more favorable treatment to at least some employees whose situation cannot reasonably be distinguished from hers. It is left to the Fourth Circuit to determine on remand whether Young also created a genuine issue of material fact as to whether UPS' reasons for having treated Young less favorably than these other nonpregnant employees were pretextual. Pp. 23–24.

707 F. 3d 437, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed an opinion concurring in the judgment. SCALIA, J., filed a dissenting opinion, in which KENNEDY and THOMAS, JJ., joined. KENNEDY, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–1226

## PEGGY YOUNG, PETITIONER *v.* UNITED PARCEL SERVICE, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 25, 2015]

JUSTICE BREYER delivered the opinion of the Court.

The Pregnancy Discrimination Act makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy. It also says that employers must treat "women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U. S. C. §2000e(k). We must decide how this latter provision applies in the context of an employer's policy that accommodates many, but not all, workers with nonpregnancy-related disabilities.

In our view, the Act requires courts to consider the extent to which an employer's policy treats pregnant workers less favorably than it treats nonpregnant workers similar in their ability or inability to work. And here—as in all cases in which an individual plaintiff seeks to show disparate treatment through indirect evidence—it requires courts to consider any legitimate, nondiscriminatory, nonpretextual justification for these differences in treatment. See *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 802 (1973). Ultimately the court must deter-

mine whether the nature of the employer's policy and the way in which it burdens pregnant women shows that the employer has engaged in intentional discrimination. The Court of Appeals here affirmed a grant of summary judgment in favor of the employer. Given our view of the law, we must vacate that court's judgment.

## I
## A

We begin with a summary of the facts. The petitioner, Peggy Young, worked as a part-time driver for the respondent, United Parcel Service (UPS). Her responsibilities included pickup and delivery of packages that had arrived by air carrier the previous night. In 2006, after suffering several miscarriages, she became pregnant. Her doctor told her that she should not lift more than 20 pounds during the first 20 weeks of her pregnancy or more than 10 pounds thereafter. App. 580. UPS required drivers like Young to be able to lift parcels weighing up to 70 pounds (and up to 150 pounds with assistance). *Id.*, at 578. UPS told Young she could not work while under a lifting restriction. Young consequently stayed home without pay during most of the time she was pregnant and eventually lost her employee medical coverage.

Young subsequently brought this federal lawsuit. We focus here on her claim that UPS acted unlawfully in refusing to accommodate her pregnancy-related lifting restriction. Young said that her co-workers were willing to help her with heavy packages. She also said that UPS accommodated other drivers who were "similar in their . . . inability to work." She accordingly concluded that UPS must accommodate her as well. See Brief for Petitioner 30–31.

UPS responded that the "other persons" whom it had accommodated were (1) drivers who had become disabled on the job, (2) those who had lost their Department of

Transportation (DOT) certifications, and (3) those who suffered from a disability covered by the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 327, 42 U. S. C. §12101 *et seq.* UPS said that, since Young did not fall within any of those categories, it had not discriminated against Young on the basis of pregnancy but had treated her just as it treated all "other" relevant "persons." See Brief for Respondent 34.

B

Title VII of the Civil Rights Act of 1964 forbids a covered employer to "discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 78 Stat. 253, 42 U. S. C. §2000e–2(a)(1). In 1978, Congress enacted the Pregnancy Discrimination Act, 92 Stat. 2076, which added new language to Title VII's definitions subsection. The first clause of the 1978 Act specifies that Title VII's "ter[m] 'because of sex' . . . include[s] . . . because of or on the basis of pregnancy, childbirth, or related medical conditions." §2000e(k). The second clause says that

> "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ." *Ibid.*

This case requires us to consider the application of the second clause to a "disparate-treatment" claim—a claim that an employer intentionally treated a complainant less favorably than employees with the "complainant's qualifications" but outside the complainant's protected class. *McDonnell Douglas, supra,* at 802. We have said that "[l]iability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision." *Raytheon Co.* v. *Hernandez,* 540 U. S.

44, 52 (2003) (ellipsis and internal quotation marks omitted). We have also made clear that a plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas.* See *Trans World Airlines, Inc.* v. *Thurston,* 469 U. S. 111, 121 (1985).

In *McDonnell Douglas*, we considered a claim of discriminatory hiring. We said that, to prove disparate treatment, an individual plaintiff must "carry the initial burden" of "establishing a prima facie case" of discrimination by showing

> "(i) that he belongs to a . . . minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U. S., at 802.

If a plaintiff makes this showing, then the employer must have an opportunity "to articulate some legitimate, non-discriminatory reason for" treating employees outside the protected class better than employees within the protected class. *Ibid.* If the employer articulates such a reason, the plaintiff then has "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant [*i.e.*, the employer] were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248, 253 (1981).

We note that employment discrimination law also creates what is called a "disparate-impact" claim. In evaluating a disparate-impact claim, courts focus on the *effects* of an employment practice, determining whether they are

unlawful irrespective of motivation or intent. See *Raytheon*, *supra*, at 52–53; see also *Ricci* v. *DeStefano*, 557 U. S. 557, 578 (2009). But Young has not alleged a disparate-impact claim.

Nor has she asserted what we have called a "pattern-or-practice" claim. See *Teamsters* v. *United States*, 431 U. S. 324, 359 (1977) (explaining that Title VII plaintiffs who allege a "pattern or practice" of discrimination may establish a prima facie case by "another means"); see also *id.,* at 357 (rejecting contention that the "burden of proof in a pattern-or-practice case must be equivalent to that outlined in *McDonnell Douglas*").

C

In July 2007, Young filed a pregnancy discrimination charge with the Equal Employment Opportunity Commission (EEOC). In September 2008, the EEOC provided her with a right-to-sue letter. See 29 CFR §1601.28 (2014). Young then filed this complaint in Federal District Court. She argued, among other things, that she could show by direct evidence that UPS had intended to discriminate against her because of her pregnancy and that, in any event, she could establish a prima facie case of disparate treatment under the *McDonnell Douglas* framework. See App. 60–62.

After discovery, UPS filed a motion for summary judgment. See Fed. Rule Civ. Proc. 56(a). In reply, Young pointed to favorable facts that she believed were either undisputed or that, while disputed, she could prove. They include the following:

　1. Young worked as a UPS driver, picking up and delivering packages carried by air. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment in No. 08–cv–02586 (D Md.), pp. 3–4 (hereinafter Memorandum).
　2. Young was pregnant in the fall of 2006. *Id.,* at 15–16.

3. Young's doctor recommended that she "not be re-
   quired to lift greater than 20 pounds for the first 20
   weeks of pregnancy and no greater than 10 pounds
   thereafter." App. 580; see also Memorandum 17.
4. UPS required drivers such as Young to be able to
   "[l]ift, lower, push, pull, leverage and manipulate
   . . . packages weighing up to 70 pounds" and to
   "[a]ssist in moving packages weighing up to 150
   pounds." App. 578; see also Memorandum 5.
5. UPS' occupational health manager, the official "re-
   sponsible for most issues relating to employee
   health and ability to work" at Young's UPS facility,
   App. 568–569, told Young that she could not return
   to work during her pregnancy because she could
   not satisfy UPS' lifting requirements, see Memo-
   randum 17−18; 2011 WL 665321, *5 (D Md., Feb.
   14, 2011).
6. The manager also determined that Young did not
   qualify for a temporary alternative work assign-
   ment. *Ibid.*; see also Memorandum 19–20.
7. UPS, in a collective-bargaining agreement, had
   promised to provide temporary alternative work
   assignments to employees "unable to perform their
   normal work assignments due to an *on-the-job* in-
   jury." App. 547 (emphasis added); see also Memo-
   randum 8, 45–46.
8. The collective-bargaining agreement also provided
   that UPS would "make a good faith effort to comply
   . . . with requests for a reasonable accommodation
   because of a permanent disability" under the ADA.
   App. 548; see also Memorandum 7.
9. The agreement further stated that UPS would give
   "inside" jobs to drivers who had lost their DOT cer-
   tifications because of a failed medical exam, a lost
   driver's license, or involvement in a motor vehicle
   accident. See App. 563–565; Memorandum 8.

10. When Young later asked UPS' Capital Division
    Manager to accommodate her disability, he replied
    that, while she was pregnant, she was "too much of
    a liability" and could "not come back" until she
    "'was no longer pregnant.'" *Id.,* at 20.
11. Young remained on a leave of absence (without
    pay) for much of her pregnancy. *Id.,* at 49.
12. Young returned to work as a driver in June 2007,
    about two months after her baby was born. *Id.,* at
    21, 61.

As direct evidence of intentional discrimination, Young
relied, in significant part, on the statement of the Capital
Division Manager (10 above). As evidence that she had
made out a prima facie case under *McDonnell Douglas*,
Young relied, in significant part, on evidence showing that
UPS would accommodate workers injured on the job (7),
those suffering from ADA disabilities (8), and those who
had lost their DOT certifications (9). That evidence, she
said, showed that UPS had a light-duty-for-injury policy
with respect to numerous "other persons," but not with
respect to pregnant workers. See Memorandum 29.

Young introduced further evidence indicating that UPS
had accommodated several individuals when they suffered
disabilities that created work restrictions similar to hers.
UPS contests the correctness of some of these facts and
the relevance of others. See Brief for Respondent 5, 6, 57.
But because we are at the summary judgment stage, and
because there is a genuine dispute as to these facts, we
view this evidence in the light most favorable to Young,
the nonmoving party, see *Scott* v. *Harris*, 550 U. S. 372,
380 (2007):

13. Several employees received accommodations while
    suffering various similar or more serious disabili-
    ties incurred on the job. See App. 400–401 (10–
    pound lifting limitation); *id.,* at 635 (foot injury);

*id.,* at 637 (arm injury).

14. Several employees received accommodations follow-
ing injury, where the record is unclear as to whether
the injury was incurred on or off the job.  See *id.,*
at 381 (recurring knee injury); *id.,* at 655 (ankle in-
jury); *id.,* at 655 (knee injury); *id.,* at 394−398
(stroke); *id.,* at 425, 636–637 (leg injury).

15. Several employees received "inside" jobs after los-
ing their DOT certifications.  See *id.,* at 372 (DOT
certification suspended after conviction for driv-
ing under the influence); *id.,* at 636, 647 (failed
DOT test due to high blood pressure); *id.,* at 640–
641 (DOT certification lost due to sleep apnea
diagnosis).

16. Some employees were accommodated despite the
fact that their disabilities had been incurred off the
job.  See *id.,* at 446 (ankle injury); *id.,* at 433, 635–
636 (cancer).

17. According to a deposition of a UPS shop steward
who had worked for UPS for roughly a decade, *id.,*
at 461, 463, "the only light duty requested [due to
physical] restrictions that became an issue" at UPS
"were with women who were pregnant," *id.,* at 504.

The District Court granted UPS' motion for summary
judgment.  It concluded that Young could not show inten-
tional discrimination through direct evidence.  2011 WL
665321, *10−*12.  Nor could she make out a prima facie
case of discrimination under *McDonnell Douglas.*  The
court wrote that those with whom Young compared her-
self—those falling within the on-the-job, DOT, or ADA
categories—were too different to qualify as "similarly
situated comparator[s]."  2011 WL 665321, *14.  The court
added that, in any event, UPS had offered a legitimate,
nondiscriminatory reason for failing to accommodate
pregnant women, and Young had not created a genuine

issue of material fact as to whether that reason was pretextual. *Id.,* at \*15.

On appeal, the Fourth Circuit affirmed. It wrote that "UPS has crafted a pregnancy-blind policy" that is "at least facially a 'neutral and legitimate business practice,' and not evidence of UPS's discriminatory animus toward pregnant workers." 707 F. 3d 437, 446 (2013). It also agreed with the District Court that Young could not show that "similarly-situated employees outside the protected class received more favorable treatment than Young." *Id.,* at 450. Specifically, it believed that Young was different from those workers who were "disabled under the ADA" (which then protected only those with permanent disabilities) because Young was "not disabled"; her lifting limitation was only "temporary and not a significant restriction on her ability to perform major life activities." *Ibid.* Young was also different from those workers who had lost their DOT certifications because "no legal obstacle stands between her and her work" and because many with lost DOT certifications retained physical (*i.e.,* lifting) capacity that Young lacked. *Ibid.* And Young was different from those "injured on the job because, quite simply, her inability to work [did] not arise from an on-the-job injury." *Id.,* at 450–451. Rather, Young more closely resembled "an employee who injured his back while picking up his infant child or . . . an employee whose lifting limitation arose from her off-the-job work as a volunteer firefighter," neither of whom would have been eligible for accommodation under UPS' policies. *Id.,* at 448.

Young filed a petition for certiorari essentially asking us to review the Fourth Circuit's interpretation of the Pregnancy Discrimination Act. In light of lower-court uncertainty about the interpretation of the Act, we granted the petition. Compare *Ensley-Gaines* v. *Runyon,* 100 F. 3d 1220, 1226 (CA6 1996), with *Urbano* v. *Continental Airlines, Inc.,* 138 F. 3d 204, 206–208 (CA5 1998); *Reeves* v.

*Swift Transp. Co.*, 446 F. 3d 637, 640−643 (CA6 2006); *Serednyj* v. *Beverly Healthcare, LLC*, 656 F. 3d 540, 547–552 (CA7 2011); *Spivey* v. *Beverly Enterprises, Inc.*, 196 F. 3d 1309, 1312–1314 (CA11 1999).

D

We note that statutory changes made after the time of Young's pregnancy may limit the future significance of our interpretation of the Act. In 2008, Congress expanded the definition of "disability" under the ADA to make clear that "physical or mental impairment[s] that substantially limi[t]" an individual's ability to lift, stand, or bend are ADA-covered disabilities. ADA Amendments Act of 2008, 122 Stat. 3555, codified at 42 U. S. C. §§12102(1)–(2). As interpreted by the EEOC, the new statutory definition requires employers to accommodate employees whose temporary lifting restrictions originate off the job. See 29 CFR pt. 1630, App., §1630.2(j)(1)(ix). We express no view on these statutory and regulatory changes.

II

The parties disagree about the interpretation of the Pregnancy Discrimination Act's second clause. As we have said, see Part I–B, *supra*, the Act's first clause specifies that discrimination "'because of sex'" includes discrimination "because of . . . pregnancy." But the meaning of the second clause is less clear; it adds: "[W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as *other persons* not so affected but *similar in their ability or inability to work*." 42 U. S. C. §2000e(k) (emphasis added). Does this clause mean that courts must compare workers *only* in respect to the work limitations that they suffer? Does it mean that courts must ignore all other similarities or differences between pregnant and nonpregnant workers? Or does it mean that courts, when

deciding who the relevant "other persons" are, may consider other similarities and differences as well? If so, which ones?

The differences between these possible interpretations come to the fore when a court, as here, must consider a workplace policy that distinguishes between pregnant and nonpregnant workers in light of characteristics not related to pregnancy. Young poses the problem directly in her reply brief when she says that the Act requires giving "the same accommodations to an employee with a pregnancy-related work limitation as it would give *that employee* if her work limitation stemmed from a different cause but had a similar effect on her inability to work." Reply Brief 15. Suppose the employer would not give "*that* [*pregnant*] *employee*" the "same accommodations" as another employee, but the employer's reason for the difference in treatment is that the pregnant worker falls within a facially neutral category (for example, individuals with off-the-job injuries). What is a court then to do?

The parties propose very different answers to this question. Young and the United States believe that the second clause of the Pregnancy Discrimination Act "requires an employer to provide the same accommodations to workplace disabilities caused by pregnancy that it provides to workplace disabilities that have other causes but have a similar effect on the ability to work." Brief for Petitioner 23. In other words, Young contends that the second clause means that whenever "an employer accommodates only a subset of workers with disabling conditions," a court should find a Title VII violation if "pregnant workers who are similar in the ability to work" do not "receive the same [accommodation] even if still other non-pregnant workers do not receive accommodations." *Id.*, at 28.

UPS takes an almost polar opposite view. It contends that the second clause does no more than define sex discrimination to include pregnancy discrimination. See

Brief for Respondent 25. Under this view, courts would compare the accommodations an employer provides to pregnant women with the accommodations it provides to others *within* a facially neutral category (such as those with off-the-job injuries) to determine whether the employer has violated Title VII. Cf. *post,* at 4 (SCALIA, J., dissenting) (hereinafter the dissent) (the clause "does not prohibit denying pregnant women accommodations . . . on the basis of an evenhanded policy").

## A

We cannot accept either of these interpretations. Young asks us to interpret the second clause broadly and, in her view, literally. As just noted, she argues that, as long as "an employer accommodates only a subset of workers with disabling conditions," "pregnant workers who are similar in the ability to work [must] receive the same treatment even if still other nonpregnant workers do not receive accommodations." Brief for Petitioner 28. She adds that, because the record here contains "evidence that pregnant and nonpregnant workers were not treated the same," that is the end of the matter, she must win; there is no need to refer to *McDonnell Douglas.* Brief for Petitioner 47.

The problem with Young's approach is that it proves too much. It seems to say that the statute grants pregnant workers a "most-favored-nation" status. As long as an employer provides one or two workers with an accommodation—say, those with particularly hazardous jobs, or those whose workplace presence is particularly needed, or those who have worked at the company for many years, or those who are over the age of 55—then it must provide similar accommodations to *all* pregnant workers (with comparable physical limitations), irrespective of the nature of their jobs, the employer's need to keep them working, their ages, or any other criteria.

Lower courts have concluded that this could not have

been Congress' intent in passing the Pregnancy Discrimination Act. See, *e.g., Urbano*, 138 F. 3d, at 206–208; *Reeves*, 466 F. 3d, at 641; *Serednyj*, 656 F. 3d, at 548–549; *Spivey*, 196 F. 3d, at 1312–1313. And Young partially agrees, for she writes that "the statute does not require employers to give" to "pregnant workers all of the benefits and privileges it extends to other" similarly disabled "employees when those benefits and privileges are . . . based on the employee's tenure or position within the company." Reply Brief 15–16; see also Tr. of Oral Arg. 22 ("[S]eniority, full-time work, different job classifications, all of those things would be permissible distinctions for an employer to make to differentiate among who gets benefits").

Young's last-mentioned concession works well with respect to seniority, for Title VII itself contains a seniority defense, see 42 U. S. C. §2000e–2(h). Hence, seniority is not part of the problem. But otherwise the most-favored-nation problem remains, and Young's concession does not solve it. How, for example, should a court treat special benefits attached to injuries arising out of, say, extrahazardous duty? If Congress intended to allow differences in treatment arising out of special duties, special service, or special needs, why would it not also have wanted courts to take account of differences arising out of special "causes"—for example, benefits for those who drive (and are injured) in extrahazardous conditions?

We agree with UPS to this extent: We doubt that Congress intended to grant pregnant workers an unconditional most-favored-nation status. The language of the statute does not require that unqualified reading. The second clause, when referring to nonpregnant persons with similar disabilities, uses the open-ended term "other persons." It does not say that the employer must treat pregnant employees the "same" as "*any* other persons" (who are similar in their ability or inability to work), nor does it

otherwise specify *which* other persons Congress had in mind.

Moreover, disparate-treatment law normally permits an employer to implement policies that are not intended to harm members of a protected class, even if their implementation sometimes harms those members, as long as the employer has a legitimate, nondiscriminatory, nonpretextual reason for doing so. See, *e.g., Raytheon*, 540 U. S., at 51–55; *Burdine*, 450 U. S., at 252–258; *McDonnell Douglas*, 411 U. S., at 802. There is no reason to believe Congress intended its language in the Pregnancy Discrimination Act to embody a significant deviation from this approach. Indeed, the relevant House Report specifies that the Act "reflect[s] no new legislative mandate." H. R. Rep. No. 95–948, pp. 3–4 (1978) (hereinafter H. R. Rep.). And the Senate Report states that the Act was designed to "reestablis[h] the law as it was understood prior to" this Court's decision in *General Electric Co.* v. *Gilbert,* 429 U. S. 125 (1976). S. Rep. No. 95–331, p. 8 (1978) (hereinafter S. Rep.). See *Gilbert, supra,* at 147 (Brennan, J., dissenting) (lower courts had held that a disability plan that compensates employees for temporary disabilities but not pregnancy violates Title VII); see also *AT&T Corp.* v. *Hulteen*, 556 U. S. 701, 717, n. 2 (2009) (GINSBURG, J., dissenting).

## B

Before Congress passed the Pregnancy Discrimination Act, the EEOC issued guidance stating that "[d]isabilities caused or contributed to by pregnancy . . . are, for all job-related purposes, temporary disabilities" and that "the availability of . . . benefits and privileges . . . shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities." 29 CFR §1604.10(b) (1975). Indeed, as early as 1972, EEOC guidelines provided:

"Disabilities caused or contributed to by pregnancy . . . are, for all job-related purposes, temporary disabilities and should be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment." 37 Fed. Reg. 6837 (1972) (codified in 29 CFR §1604.10(b) (1973)).

Soon after the Act was passed, the EEOC issued guidance consistent with its pre-Act statements. The EEOC explained: "Disabilities caused or contributed to by pregnancy . . . for all job-related purposes, shall be treated the same as disabilities caused or contributed to by other medical conditions." See §1604.10(b) (1979). Moreover, the EEOC stated that "[i]f other employees temporarily unable to lift are relieved of these functions, pregnant employees also unable to lift must be temporarily relieved of the function." 29 CFR pt. 1604, App., p. 918.

This post-Act guidance, however, does not resolve the ambiguity of the term "other persons" in the Act's second clause. Rather, it simply tells employers to treat pregnancy-related disabilities like nonpregnancy-related disabilities, without clarifying how that instruction should be implemented when an employer does not treat all nonpregnancy-related disabilities alike.

More recently—in July 2014—the EEOC promulgated an additional guideline apparently designed to address this ambiguity. That guideline says that "[a]n employer may not refuse to treat a pregnant worker the same as other employees who are similar in their ability or inability to work by relying on a policy that makes distinctions based on the source of an employee's limitations (e.g., a policy of providing light duty only to workers injured on the job)." 2 EEOC Compliance Manual §626–I(A)(5), p. 626:0009 (July 2014). The EEOC also provided an example of disparate treatment that would violate the Act:

"An employer has a policy or practice of providing

light duty, subject to availability, for any employee who cannot perform one or more job duties for up to 90 days due to injury, illness, or a condition that would be a disability under the ADA. An employee requests a light duty assignment for a 20–pound lifting restriction related to her pregnancy. The employer denies the light duty request." *Id.,* at 626:0013, Example 10.

The EEOC further added that "an employer may not deny light duty to a pregnant employee based on a policy that limits light duty to employees with on-the-job injuries." *Id.,* at 626:0028.

The Solicitor General argues that we should give special, if not controlling, weight to this guideline. He points out that we have long held that "the rulings, interpretations and opinions" of an agency charged with the mission of enforcing a particular statute, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944). See Brief for United States as *Amicus Curiae* 26.

But we have also held that the "weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors that give it power to persuade, if lacking power to control." *Skidmore*, *supra,* at 140. These qualifications are relevant here and severely limit the EEOC's July 2014 guidance's special power to persuade.

We come to this conclusion not because of any agency lack of "experience" or "informed judgment." Rather, the difficulties are those of timing, "consistency," and "thoroughness" of "consideration." The EEOC promulgated its 2014 guidelines only recently, after this Court had granted

certiorari in this case. In these circumstances, it is fair to say that the EEOC's current guidelines take a position about which the EEOC's previous guidelines were silent. And that position is inconsistent with positions for which the Government has long advocated. See Brief for Defendant-Appellee in *Ensley-Gaines* v. *Runyon*, No. 95–1038 (CA6 1996), pp. 26–27 (explaining that a reading of the Act like Young's was "simply incorrect" and "runs counter" to this Court's precedents). See also Brief for United States as *Amicus Curiae* 16, n. 2 ("The Department of Justice, on behalf of the United States Postal Service, has previously taken the position that pregnant employees with work limitations are not similarly situated to employees with similar limitations caused by on-the-job injuries"). Nor does the EEOC explain the basis of its latest guidance. Does it read the statute, for example, as embodying a most-favored-nation status? Why has it now taken a position contrary to the litigation position the Government previously took? Without further explanation, we cannot rely significantly on the EEOC's determination.

C

We find it similarly difficult to accept the opposite interpretation of the Act's second clause. UPS says that the second clause simply defines sex discrimination to include pregnancy discrimination. See Brief for Respondent 25. But that cannot be so.

The first clause accomplishes that objective when it expressly amends Title VII's definitional provision to make clear that Title VII's words "because of sex" and "on the basis of sex" "include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U. S. C. §2000e(k). We have long held that "'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause'" is rendered "'superflu-

ous, void, or insignificant.'" *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001) (quoting *Duncan* v. *Walker*, 533 U. S. 167, 174 (2001)). But that is what UPS' interpretation of the second clause would do.

The dissent, basically accepting UPS' interpretation, says that the second clause is not "superfluous" because it adds "clarity." *Post,* at 4–5 (internal quotation marks omitted). It makes "plain," the dissent adds, that unlawful discrimination "includes disfavoring pregnant women relative to other workers of similar inability to work." *Post,* at 5. Perhaps we fail to understand. *McDonnell Douglas* itself makes clear that courts normally consider how a plaintiff was treated relative to other "persons of [the plaintiff's] qualifications" (which here include disabilities). 411 U. S., at 802. If the second clause of the Act did not exist, we would still say that an employer who disfavored pregnant women relative to other workers of similar ability or inability to work had engaged in pregnancy discrimination. In a word, there is no need for the "clarification" that the dissent suggests the second sentence provides.

Moreover, the interpretation espoused by UPS and the dissent would fail to carry out an important congressional objective. As we have noted, Congress' "unambiguou[s]" intent in passing the Act was to overturn "both the holding and the reasoning of the Court in the *Gilbert* decision." *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 678 (1983); see also *post*, at 6 (recognizing that "the object of the Pregnancy Discrimination Act is to displace this Court's conclusion in [*Gilbert*]"). In *Gilbert*, the Court considered a company plan that provided "nonoccupational sickness and accident benefits to all employees" without providing "disability-benefit payments for any absence due to pregnancy." 429 U. S., at 128, 129. The Court held that the plan did not violate Title VII; it did not discriminate on the basis of sex because there was "no

risk from which men are protected and women are not."
*Id.,* at 138 (internal quotation marks omitted).  Although
pregnancy is "confined to women," the majority believed it
was not "comparable in all other respects to [the] diseases
or disabilities" that the plan covered.  *Id.,* at 136.  Specifi-
cally, the majority explained that pregnancy "is not a
'disease' at all," nor is it necessarily a result of accident.
*Ibid.*  Neither did the majority see the distinction the
plan drew as "a subterfuge" or a "pretext" for engaging in
gender-based discrimination.  *Ibid.*  In short, the *Gilbert*
majority reasoned in part just as the dissent reasons here.
The employer did "not distinguish between pregnant
women and others of similar ability or inability *because of
pregnancy." Post,* at 2.  It distinguished between them on
a neutral ground—*i.e.,* it accommodated only sicknesses
and accidents, and pregnancy was neither of those.  See
429 U. S., at 136.

Simply including pregnancy among Title VII's protected
traits (*i.e.,* accepting UPS' interpretation) would not over-
turn *Gilbert* in full—in particular, it would not respond to
*Gilbert*'s determination that an employer can treat preg-
nancy less favorably than diseases or disabilities resulting
in a similar inability to work.  As we explained in *Califor-
nia Fed. Sav. & Loan Assn.* v. *Guerra,* 479 U. S. 272
(1987), "the first clause of the [Act] reflects Congress'
disapproval of the reasoning in *Gilbert*" by "adding preg-
nancy to the definition of sex discrimination prohibited by
Title VII."  *Id.,* at 284.  But the second clause was intended
to do more than that—it "was intended to overrule the
holding in *Gilbert* and to illustrate how discrimination
against pregnancy is to be remedied."  *Id.,* at 285.  The
dissent's view, like that of UPS', ignores this precedent.

## III

The statute lends itself to an interpretation other than
those that the parties advocate and that the dissent sets

forth. Our interpretation minimizes the problems we have discussed, responds directly to *Gilbert,* and is consistent with longstanding interpretations of Title VII.

In our view, an individual pregnant worker who seeks to show disparate treatment through indirect evidence may do so through application of the *McDonnell Douglas* framework. That framework requires a plaintiff to make out a prima facie case of discrimination. But it is "not intended to be an inflexible rule." *Furnco Constr. Corp.* v. *Waters*, 438 U. S. 567, 575 (1978). Rather, an individual plaintiff may establish a prima facie case by "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under" Title VII. *Id.,* at 576 (internal quotation marks omitted). The burden of making this showing is "not onerous." *Burdine*, 450 U. S., at 253. In particular, making this showing is not as burdensome as succeeding on "an ultimate finding of fact as to" a discriminatory employment action. *Furnco, supra,* at 576. Neither does it require the plaintiff to show that those whom the employer favored and those whom the employer disfavored were similar in all but the protected ways. See *McDonnell Douglas*, 411 U. S., at 802 (burden met where plaintiff showed that employer hired other "qualified" individuals outside the protected class); *Furnco, supra,* at 575–577 (same); *Burdine, supra,* at 253 (same). Cf. *Reeves* v. *Sanderson Plumbing Products, Inc.*, 530 U. S. 133, 142 (2000) (similar).

Thus, a plaintiff alleging that the denial of an accommodation constituted disparate treatment under the Pregnancy Discrimination Act's second clause may make out a prima facie case by showing, as in *McDonnell Douglas*, that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others "simi-

lar in their ability or inability to work."

The employer may then seek to justify its refusal to accommodate the plaintiff by relying on "legitimate, non-discriminatory" reasons for denying her accommodation. 411 U. S., at 802. But, consistent with the Act's basic objective, that reason normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those ("similar in their ability or inability to work") whom the employer accommodates. After all, the employer in *Gilbert* could in all likelihood have made just such a claim.

If the employer offers an apparently "legitimate, non-discriminatory" reason for its actions, the plaintiff may in turn show that the employer's proffered reasons are in fact pretextual. We believe that the plaintiff may reach a jury on this issue by providing sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's "legitimate, nondiscriminatory" reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden imposed—give rise to an inference of intentional discrimination.

The plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers. Here, for example, if the facts are as Young says they are, she can show that UPS accommodates most nonpregnant employees with lifting limitations while categorically failing to accommodate pregnant employees with lifting limitations. Young might also add that the fact that UPS has multiple policies that accommodate nonpregnant employees with lifting restrictions suggests that its reasons for failing to accommodate pregnant employees with lifting restrictions are not sufficiently strong—to the point that a jury could

find that its reasons for failing to accommodate pregnant employees give rise to an inference of intentional discrimination.

This approach, though limited to the Pregnancy Discrimination Act context, is consistent with our longstanding rule that a plaintiff can use circumstantial proof to rebut an employer's apparently legitimate, nondiscriminatory reasons for treating individuals within a protected class differently than those outside the protected class. See *Burdine*, *supra*, at 255, n. 10. In particular, it is hardly anomalous (as the dissent makes it out to be, see *post*, at 8–9) that a plaintiff may rebut an employer's proffered justifications by showing how a policy operates in practice. In *McDonnell Douglas* itself, we noted that an employer's "general policy and practice with respect to minority employment"—including "statistics as to" that policy and practice—could be evidence of pretext. 411 U. S., at 804–805. Moreover, the continued focus on whether the plaintiff has introduced sufficient evidence to give rise to an inference of *intentional* discrimination avoids confusing the disparate-treatment and disparate-impact doctrines, cf. *post*, at 8–10.

Our interpretation of the Act is also, unlike the dissent's, consistent with Congress' intent to overrule *Gilbert*'s reasoning and result. The dissent says that "[i]f a pregnant woman is denied an accommodation under a policy that does not discriminate against pregnancy, she *has* been 'treated the same' as everyone else." *Post*, at 2. This logic would have found no problem with the employer plan in *Gilbert*, which "denied an accommodation" to pregnant women on the same basis as it denied accommodations to other employees—*i.e.,* it accommodated only sicknesses and accidents, and pregnancy was neither of those. See Part II–C, *supra*. In arguing to the contrary, the dissent's discussion of *Gilbert* relies exclusively on the opinions of the dissenting Justices in that case. See *post*,

at 6–7. But Congress' intent in passing the Act was to overrule the *Gilbert majority* opinion, which viewed the employer's disability plan as denying coverage to pregnant employees on a neutral basis.

## IV

Under this interpretation of the Act, the judgment of the Fourth Circuit must be vacated. A party is entitled to summary judgment if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a). We have already outlined the evidence Young introduced. See Part I–C, *supra*. Viewing the record in the light most favorable to Young, there is a genuine dispute as to whether UPS provided more favorable treatment to at least some employees whose situation cannot reasonably be distinguished from Young's. In other words, Young created a genuine dispute of material fact as to the fourth prong of the *McDonnell Douglas* analysis.

Young also introduced evidence that UPS had three separate accommodation policies (on-the-job, ADA, DOT). Taken together, Young argued, these policies significantly burdened pregnant women. See App. 504 (shop steward's testimony that "the only light duty requested [due to physical] restrictions that became an issue" at UPS "were with women who were pregnant"). The Fourth Circuit did not consider the combined effects of these policies, nor did it consider the strength of UPS' justifications for each when combined. That is, why, when the employer accommodated so many, could it not accommodate pregnant women as well?

We do not determine whether Young created a genuine issue of material fact as to whether UPS' reasons for having treated Young less favorably than it treated these other nonpregnant employees were pretextual. We leave a final determination of that question for the Fourth Circuit

to make on remand, in light of the interpretation of the Pregnancy Discrimination Act that we have set out above.

\*     \*     \*

For the reasons above, we vacate the judgment of the Fourth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1226

_____

## PEGGY YOUNG, PETITIONER *v.* UNITED PARCEL SERVICE, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[March 25, 2014]

JUSTICE ALITO, concurring in the judgment.

As originally enacted, Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e–2(a)(1), made it an unlawful employment practice to discriminate "because of [an] individual's . . . sex" but made no mention of discrimination because of pregnancy. In *General Elec. Co.* v. *Gilbert*, 429 U. S. 125, 135–140 (1976), this Court held that Title VII did not reach pregnancy discrimination. Congress responded by enacting the Pregnancy Discrimination Act (PDA), which added subsection (k) to a definitional provision, §2000e. Subsection (k) contains two clauses. The first is straightforward; the second is not.

I

The first clause provides that "the terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy."[1] This clause has the effect of adding pregnancy to the list of prohibited grounds (race, sex, etc.) originally included in §2000e–2(a)(1). Claims of discrimination under that provision require proof of discriminatory intent. See, *e.g., Ricci* v.

_____

[1] While §2000e–2(a) uses the phrase "because of . . . sex," other provisions governed by the definitions in §2000e use the phrase "on the basis of . . . sex." See, *e.g.,* §§2000e–2(b), (k)(1)(A). Therefore, subsection (k) covers this phrase as well.

*DeStefano*, 557 U. S. 557, 577 (2009); *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977, 985–986 (1988). Thus, as a result of the first clause, an employer engages in unlawful discrimination under §2000e–2(a)(1) if (and only if) the employer's intent is to discriminate because of or on the basis of pregnancy.

If an employer treats a pregnant woman unfavorably for any other reason, the employer is not guilty of an unlawful employment practice under §2000e–2(a), as defined by the first clause of the PDA. And under this first clause, it does not matter whether the employer's ground for the unfavorable treatment is reasonable; all that matters is the employer's actual intent. Of course, when an employer claims to have made a decision for a reason that does not seem to make sense, a factfinder *may* infer that the employer's asserted reason for its action is a pretext for unlawful discrimination. But if the factfinder is convinced that the employer acted for some reason other than pregnancy, the employer cannot be held liable under this clause.

## II

The PDA, however, does not simply prohibit discrimination because of or on the basis of pregnancy. Instead, the second clause in §2000e(k) goes on to say the following: "and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." This clause raises several difficult questions of interpretation that are pertinent to the case now before us.

## A

First, does this clause simply explain what is meant by discrimination because of or on the basis of pregnancy? Or

does it impose an additional restriction on employer conduct? I believe that this clause does not merely explain but instead adds to the language that precedes it.

This is the interpretation that is most consistent with the statutory text. This clause begins with the word "and," which certainly suggests that what follows represents an addition to what came before.

It is also revealing that the second clause makes no reference to intent, which is the linchpin of liability under the first clause, and that the second clause is an affirmative command (an employer "shall" provide equal treatment), while the first clause is negative (it prohibits discrimination). If a careful drafter wanted to make it clear that the second clause does no more than explain what is meant by the first, the language of the second clause would have to be substantially modified.

Finally, if the second clause does not set out an additional restriction on employer conduct, it would appear to be largely, if not entirely, superfluous. See, *e.g., Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 299, n. 1 (2006) ("[I]t is generally presumed that statutes do not contain surplusage"). As noted, the first clause, by adding pregnancy to the list of prohibited grounds for adverse employment actions, mandates that discrimination because of pregnancy be treated like discrimination because of race, sex, etc. An employer commits an unlawful employment practice if it intentionally treats employees of a particular race or sex less favorably than other employees who are similar in their ability or inability to work. Accordingly, the first clause of the PDA is alone sufficient to make it clear that an employer is guilty of an unlawful employment practice if it intentionally treats pregnant employees less favorably than others who are similar in their ability or inability to work.[2] For these

--------

[2] JUSTICE SCALIA's dissent argues, *post,* at 4–6, that the second clause

reasons, I conclude that the second clause does not merely explain the first but adds a further requirement of equal treatment irrespective of intent.

B

This leads to the second question: In determining whether pregnant employees have been given the equal treatment that this provision demands, with whom must the pregnant employees be compared? I interpret the second clause to mean that pregnant employees must be compared with employees performing the same or very similar jobs. Pregnant employees, the second provision states, must be given the same treatment as other employees who are "similar in their ability or inability to work." An employee's ability to work—despite illness, injury, or pregnancy—often depends on the tasks that the employee's job includes. Different jobs have different tasks, and different tasks require different abilities. Suppose that an employer provides a period of leave with pay for employees whose jobs require tasks, *e.g.*, lifting heavy objects, that they cannot perform because of illness or injury. Must the employer provide the same benefits for pregnant employees who are unable to lift heavy objects but have desk jobs that do not entail heavy lifting? The answer is no. The treatment of pregnant employees

_____

serves the useful purpose of clarifying the meaning of discrimination because of pregnancy. Without the second clause, that dissent maintains, there might be uncertainty as to whether an employer would commit an unlawful employment practice if it excluded pregnancy from an otherwise complete disability benefits program. Contrary to the dissent, however, I think that the answer to this question would be quite obvious based on the first clause of the PDA alone. If an employer provided benefits for every employee who was temporarily unable to work due to any physical condition other than pregnancy, that employer would be in the same position as an employer who provided similar benefits for employees of every race but one. In both situations, the employer would clearly discriminate on a prohibited ground.

must be compared with the treatment of nonpregnant employees whose jobs involve the performance of the same or very similar tasks.

## C

This conclusion leads to a third, even more difficult question: When comparing pregnant employees to non-pregnant employees in similar jobs, which characteristics of the pregnant and nonpregnant employees must be taken into account? The answer, I believe, must be found in the reference to "other employees who are similar in their ability or inability to work." I see two possible interpretations of this language. The first is that the capacity to perform the tasks required by a job is the only relevant characteristic, but like the Court, *ante,* at 12–14, I cannot accept this "most favored employee" interpretation.

This interpretation founders when, as in this case, an employer treats pregnant women less favorably than some but not all nonpregnant employees who have similar jobs and are similarly impaired in their ability to perform the tasks that these jobs require. In this case, as I will explain below, see Part III, United Parcel Service (UPS) drivers who were unable to perform the physical tasks required by that job fell into three groups: first, nonpregnant employees who received favorable treatment; second, nonpregnant employees who do not receive favorable treatment; and third, pregnant employees who, like the nonpregnant employees in the second category, did not receive favorable treatment. Under these circumstances, would the "most favored employee" interpretation require the employer to treat the pregnant women like the employees in the first, favored group? Or would it be sufficient if the employer treated them the same as the non-pregnant employees in the second group who did not receive favorable treatment?

Recall that the second clause of §2000e(k) requires that

pregnant women "be treated the same for all employment-related purposes . . . as *other persons* not so affected but similar in their ability or inability to work." (Emphasis added.) Therefore, UPS could say that its policy treated the pregnant employees the same as "other persons" who were similar in their ability or inability to work, namely, those nonpregnant employees in the second category. But at the same time, the pregnant drivers like petitioner could say that UPS did not treat them the same as "other employees" who were similar in their ability or inability to work, namely, the nonpregnant employees in the first group. An interpretation that leads to such a problem cannot be correct.[3]

I therefore turn to the other possible interpretation of the phrase "similar in their ability or inability to work," namely, that "similar in the ability or inability to work" means "similar *in relation* to the ability or inability to work."[4] Under this interpretation, pregnant and non-

―――――――――

[3] The "most favored employee" interpretation would also lead to wildly implausible results. Suppose, for example, that an employer had a policy of refusing to provide any accommodation for any employee who was unable to work due to any reason but that the employer wished to make an exception for several employees who were seriously injured while performing acts of extraordinary heroism on the job, for example, saving the lives of numerous fellow employees during a fire in the workplace. If the ability to perform job tasks was the only characteristic that could be considered, the employer would face the choice of either denying any special treatment for the heroic employees or providing all the same benefits to all pregnant employees. It is most unlikely that this is what Congress intended. Such a requirement would go beyond anything demanded by any other antidiscrimination law.

[4] Opinions have often used the phrase "similar in" to mean "similar in relation to" or "similar with respect to." See, *e.g., Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. ___, ___ (2013) (BREYER, J., concurring in judgment) (slip op., at 3) ("similar in character and specificity to piracy"); *Williams* v. *Illinois*, 567 U. S. ___, ___ (2012) (THOMAS, J., concurring in judgment) (slip op., at 10) ("similar in solemnity to the Marian examination practices that the Confrontation Clause was designed to

pregnant employees are not similar in relation to the
ability or inability to work if they are unable to work for
different reasons. And this means that these two groups
of employees are not similar in the relevant sense if the
employer has a neutral business reason for treating them
differently. I agree with the Court that a sufficient reason
"normally cannot consist simply of a claim that it is more
expensive or less convenient to add pregnant women to the
category of those . . . whom the employer accommodates."
*Ante*, at 21.[5]  Otherwise, however, I do not think that the
second clause of the PDA authorizes courts to evaluate the
justification for a truly neutral rule. The language used in
the second clause of the PDA is quite different from that
used in other antidiscrimination provisions that require
such an evaluation. Cf. §12112(b)(5)(A) (discrimination
against a person with a disability includes "not making
*reasonable accommodations* to the known physical or
mental limitations of an otherwise qualified . . . employee,
unless [the employer] can demonstrate that the accommo-
dation would impose *an undue hardship* on the operation
of [its] business" (emphasis added)); §2000e(j) (employer
must reasonably accommodate religious observance, prac-
tice, and belief unless that would impose an "undue hard-
ship on the conduct of the employer's business"); §2000e–
2(k)(1)(A)(i) (business necessity defense in Title VII
disparate-impact cases).

--------

prevent"). *Sykes* v. *United States*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at
6) ("similar in degree of danger to that involved in arson").

  [5] If cost alone could justify unequal treatment of pregnant employees,
the plan at issue in *General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976),
would be lawful. Cf. *id.*, at 138. But this Court has repeatedly said
that the PDA rejected "'both the holding and the reasoning'" in *Gilbert*.
*AT&T* v. *Hulteen*, 556 U. S. 701, 720 (2009) (GINSBURG, J., dissenting)
(quoting *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462
U. S. 669, 678 (1983).

### III

I understand petitioner in this case to assert claims under both the first and second clauses of §2000e(k). With respect to her claim under the first clause, I agree with the Court that the information in the summary judgment record is sufficient (albeit barely) to take the question to the trier of fact.

I believe that the judgment of the Court of Appeals with respect to petitioner's claim under the second clause must also be vacated. Petitioner sought to be excused during her pregnancy from the lifting requirements that were among her tasks as a driver. Under the policy that United Parcel Service claims to have had in force at the time in question, drivers who were physically unable to perform the tasks required by that position fell into three groups.

First, some drivers were reassigned to less physically demanding positions. Included in this group were (a) those who were unable to work as drivers due to an injury incurred on the job, (b) those drivers who were unable to work as drivers due to a disability as defined by the Americans With Disabilities Act of 1990 (ADA), and (c) those drivers who, as the result of a medical condition or injury, lost the Department of Transportation (DOT) certification needed to work in that capacity.

The second group of drivers consisted of those who were not pregnant and were denied transfer to a light-duty job. Drivers who were injured off the job fell into this category. The third group was made up of pregnant drivers like petitioner.

It is obvious that respondent had a neutral reason for providing an accommodation when that was required by the ADA. Respondent also had neutral grounds for providing special accommodations for employees who were injured on the job. If these employees had not been permitted to work at all, it appears that they would have been eligible for workers' compensation benefits. See Md.

Lab. & Empl. Code Ann. §9–614 (2008).

The accommodations that are provided to drivers who lost their DOT certifications, however, are another matter. A driver may lose DOT certification for a variety of reasons, including medical conditions or injuries incurred off the job that impair the driver's ability to operate a motor vehicle. Such drivers may then be transferred to jobs that do not require physical tasks incompatible with their illness or injury. It does not appear that respondent has provided any plausible justification for treating these drivers more favorably than drivers who were pregnant.

The Court of Appeals provided two grounds for distinguishing petitioner's situation from that of the drivers who had lost their DOT certifications, see 707 F. 3d 437, 450 (CA4 2013), but neither is adequate. First, the Court of Appeals noted that "no legal obstacle [stood] between [petitioner] and her work." *Ibid.* But the legal obstacle faced by drivers who have lost DOT certification only explains why those drivers could not continue to perform all the tasks required by their ordinary jobs; it does not explain why respondent went further and *provided such drivers with a work accommodation.* Petitioner's pregnancy prevented her from continuing her normal work as a driver, just as is the case for a driver who loses DOT certification. But respondent had a policy of accommodating drivers who lost DOT certification but not accommodating pregnant women, like petitioner. The legal obstacle of lost certification cannot explain this difference in treatment.

Second, the Court of Appeals observed that "'those with DOT certification maintai[n] the ability to perform any number of demanding physical tasks,'" *ibid.*, but it is doubtful that this is true in all instances. A driver can lose DOT certification due to a great variety of medical conditions, including loss of a limb, 49 CFR §391.41(b)(1) (2013); impairments of the arm, hand, finger, foot, or leg, §391.41(b)(2)(i) and (ii); cardiovascular disease,

§391.41(b)(4); respiratory dysfunction, §391.41(b)(5); high blood pressure, §391.41(b)(6); arthritis, §391.41(b)(7); and epilepsy §391.41(b)(8). It is not evident—and as far as I am aware, the record does not show—that all drivers with these conditions are nevertheless able to perform a great many physically demanding tasks. Nevertheless, respondent says that it was its policy to transfer such drivers to so-called inside jobs when such positions were available. Presumably, respondent did not assign these drivers to jobs that they were physically unable to perform. So in at least some instances, they must have been assigned to jobs that did not require them to perform tasks that they were incapable of performing due to the medical condition that caused the loss of DOT certification. Respondent has not explained why pregnant drivers could not have been given similar consideration.

For these reasons, it is not at all clear that respondent had any neutral business ground for treating pregnant drivers less favorably than at least some of its nonpregnant drivers who were reassigned to other jobs that they were physically capable of performing. I therefore agree with the Court that the decision of the Court of Appeals with respect to petitioner's claim under the second clause of the PDA must be vacated, and the case must be remanded for further proceedings with respect to that claim.

# SUPREME COURT OF THE UNITED STATES

———————

No. 12–1226

———————

## PEGGY YOUNG, PETITIONER *v.* UNITED PARCEL SERVICE, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 25, 2015]

JUSTICE SCALIA, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, dissenting.

Faced with two conceivable readings of the Pregnancy Discrimination Act, the Court chooses neither. It crafts instead a new law that is splendidly unconnected with the text and even the legislative history of the Act. To "treat" pregnant workers "the same . . . as other persons," we are told, means refraining from adopting policies that impose "significant burden[s]" upon pregnant women without "sufficiently strong" justifications. *Ante,* at 21. Where do the "significant burden" and "sufficiently strong justification" requirements come from? Inventiveness posing as scholarship—which gives us an interpretation that is as dubious in principle as it is senseless in practice.

## I

Title VII forbids employers to discriminate against employees "because of . . . sex." 42 U. S. C. §2000e–2(a)(1). The Pregnancy Discrimination Act adds a provision to Title VII's definitions section:

"The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same

for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . ." §2000e(k).

Title VII's prohibition of discrimination creates liability for both disparate treatment (taking action with "discriminatory motive") and disparate impact (using a practice that "fall[s] more harshly on one group than another and cannot be justified by business necessity"). *Teamsters* v. *United States*, 431 U. S. 324, 335–336, n. 15 (1977). Peggy Young did not establish pregnancy discrimination under either theory. She argued that United Parcel Service's refusal to accommodate her inability to work amounted to disparate treatment, but the Court of Appeals concluded that she had not mustered evidence that UPS denied the accommodation with intent to disfavor pregnant women. 707 F. 3d 437, 449–451 (CA4 2013). And Young never brought a claim of disparate impact.

That is why Young and the Court leave behind the part of the law defining pregnancy discrimination as sex discrimination, and turn to the part requiring that "women affected by pregnancy . . . be treated the same . . . as other persons not so affected but similar in their ability or inability to work." §2000e(k). The most natural way to understand the same-treatment clause is that an employer may not distinguish between pregnant women and others of similar ability or inability *because of pregnancy*. Here, that means pregnant women are entitled to accommodations *on the same terms* as other workers with disabling conditions. If a pregnant woman is denied an accommodation under a policy that does not discriminate against pregnancy, she *has* been "treated the same" as everyone else. UPS's accommodation for drivers who lose their certifications illustrates the point. A pregnant woman who loses her certification gets the benefit, just like any

other worker who loses his. And a pregnant woman who keeps her certification does not get the benefit, again just like any other worker who keeps his. That certainly sounds like treating pregnant women and others the same.

There is, however, another way to understand "treated the same," at least looking at that phrase on its own. One could read it to mean that an employer may not distinguish *at all* between pregnant women and others of similar ability. Here, that would mean pregnant women are entitled, not to accommodations on the same terms as others, but to *the same accommodations* as others, no matter the differences (other than pregnancy) between them. UPS's accommodation for decertified drivers illustrates this usage too. There is a sense in which a pregnant woman denied an accommodation (because she kept her certification) has *not* been treated the same as an injured man granted an accommodation (because he lost his certification). He got the accommodation and she did not.

Of these two readings, only the first makes sense in the context of Title VII. The point of Title VII's bans on discrimination is to prohibit employers from treating one worker differently from another *because of a protected trait*. It is not to prohibit employers from treating workers differently for reasons that have nothing to do with protected traits. See *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248, 259 (1981). Against that backdrop, a requirement that pregnant women and other workers be treated the same is sensibly read to forbid distinctions that discriminate against pregnancy, not all distinctions whatsoever.

Prohibiting employers from making *any* distinctions between pregnant workers and others of similar ability would elevate pregnant workers to most favored employees. If Boeing offered chauffeurs to injured directors, it

would have to offer chauffeurs to pregnant mechanics. And if Disney paid pensions to workers who can no longer work because of old age, it would have to pay pensions to workers who can no longer work because of childbirth. It is implausible that Title VII, which elsewhere creates guarantees of *equal* treatment, here alone creates a guarantee of *favored* treatment.

Let it not be overlooked, moreover, that the thrust of the Pregnancy Discrimination Act is that pregnancy discrimination is sex discrimination. Instead of creating a free-standing ban on pregnancy discrimination, the Act makes plain that the existing ban on sex discrimination reaches discrimination because of pregnancy. Reading the same-treatment clause to give pregnant women special protection unavailable to other women would clash with this central theme of the Act, because it would mean that pregnancy discrimination differs from sex discrimination after all.

All things considered, then, the right reading of the same-treatment clause prohibits practices that discriminate against pregnant women relative to workers of similar ability or inability. It does not prohibit denying pregnant women accommodations, or any other benefit for that matter, on the basis of an evenhanded policy.

## II

The Court agrees that the same-treatment clause is not a most-favored-employee law, *ante,* at 12, but at the same time refuses to adopt the reading I propose—which is the only other reading the clause could conceivably bear. The Court's reasons for resisting this reading fail to persuade.

The Court starts by arguing that the same-treatment clause must do more than ban distinctions on the basis of pregnancy, lest it add nothing to the part of the Act defining pregnancy discrimination as sex discrimination. *Ante,* at 17. Even so read, however, the same-treatment clause

*does* add something: clarity.  See *Newport News Ship-building & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 678, n. 14 (1983) ("[T]he specific language in the second clause . . . explains the application of the [first clause]").  Just defining pregnancy discrimination as sex discrimination does not tell us what it means to discriminate because of pregnancy.  Does pregnancy discrimination include, in addition to disfavoring pregnant women relative to the workplace in general, disfavoring them relative to disabled workers in particular?  Concretely, does an employer engage in pregnancy discrimination by excluding pregnancy from an otherwise complete disability-benefits program?  Without the same-treatment clause, the answers to these questions would not be obvious.  An employer could argue that people do not necessarily think of pregnancy and childbirth as disabilities.  Or that it would be anomalous to read a law defining pregnancy discrimination as sex discrimination to require him to treat *pregnancy* like a disability, when Title VII does not require him to treat *sex* like a disability.  Or that even if pregnancy were a disability, it would be *sui generis*—categorically different from all other disabling conditions.  Cf. *Geduldig* v. *Aiello*, 417 U. S. 484, 494–495 (1974) (holding that a State has a rational basis for excluding pregnancy-related disabilities from a disability-benefits program).  With the same-treatment clause, these doubts disappear.  By requiring that women affected by pregnancy "be treated the same . . . *as other persons not so affected but similar in their ability or inability to work*" (emphasis added), the clause makes plain that pregnancy discrimination includes disfavoring pregnant women relative to other workers of similar inability to work.

   This clarifying function easily overcomes any charge that the reading I propose makes the same-treatment clause "'superfluous, void, or insignificant.'" *Ante,* at 17–18.  Perhaps, as the Court suggests, even without the

same-treatment clause the best reading of the Act would prohibit disfavoring pregnant women relative to disabled workers. But laws often make explicit what might already have been implicit, "for greater caution" and in order "to leave nothing to construction." The Federalist No. 33, pp. 205–206 (J. Cooke ed. 1961) (A. Hamilton). That is why we have long acknowledged that a "sufficient" explanation for the inclusion of a clause can be "found in the desire to remove all doubts" about the meaning of the rest of the text. *McCulloch* v. *Maryland*, 4 Wheat. 316, 420 (1819). This explanation looks all the more sensible once one remembers that the object of the Pregnancy Discrimination Act is to displace this Court's conclusion in *General Elec. Co.* v. *Gilbert*, 429 U. S. 125 (1976), that pregnancy discrimination is not sex discrimination. What could be more natural than for a law whose object is superseding earlier judicial interpretation to include a clause whose object is leaving nothing to future judicial interpretation?

That brings me to the Court's remaining argument: the claim that the reading I have set forth would not suffice to overturn our decision in *Gilbert*. *Ante,* at 18–20. Wrong. *Gilbert* upheld an otherwise comprehensive disability-benefits plan that singled pregnancy out for disfavor. The most natural reading of the Act overturns that decision, because it prohibits singling pregnancy out for disfavor.

The Court goes astray here because it mistakenly assumes that the *Gilbert* plan excluded pregnancy on "a neutral ground"—covering sicknesses and accidents but nothing else. *Ante,* at 19. In reality, the plan in *Gilbert* was not neutral toward pregnancy. It "place[d] . . . pregnancy in a class by itself," treating it differently from "any other kind" of condition. 429 U. S., at 161 (Stevens, J., dissenting). At the same time that it denied coverage for pregnancy, it provided coverage for a comprehensive range of other conditions, including many that one would not necessarily call sicknesses or accidents—like "sport inju-

ries, attempted suicides, . . . disabilities incurred in the commission of a crime or during a fight, and elective cosmetic surgery," *id.,* at 151 (Brennan, J., dissenting). What is more, the plan denied coverage even to sicknesses, if they were related to pregnancy or childbirth. *Ibid.* For that matter, the plan denied coverage to sicknesses that were *unrelated* to pregnancy or childbirth, if they were suffered during recovery from the birth of a child. *Ibid. Gilbert*, there can be no doubt, involved "the lone exclusion of pregnancy from [a] program." *Ibid.* The most natural interpretation of the Act easily suffices to make that unlawful.

## III

Dissatisfied with the only two readings that the words of the same-treatment clause could possibly bear, the Court decides that the clause means something in-between. It takes only a couple of waves of the Supreme Wand to produce the desired result. Poof!: The same-treatment clause means that a neutral reason for refusing to accommodate a pregnant woman is pretextual if "the employer's policies impose a significant burden on pregnant workers." *Ante,* at 21. Poof!: This is so only when the employer's reasons "are not sufficiently strong to justify the burden." *Ibid.*

How we got here from the same-treatment clause is anyone's guess. There is no way to read "shall be treated the same"—or indeed anything else in the clause—to mean that courts must balance the significance of the burden on pregnant workers against the strength of the employer's justifications for the policy. That is presumably why the Court does not even *try* to connect the interpretation it adopts with the text it purports to interpret. The Court has forgotten that statutory purpose and the presumption against superfluity are tools for choosing among competing reasonable readings of a law, not au-

thorizations for making up new readings that the law cannot reasonably bear.

The fun does not stop there. Having ignored the terms of the same-treatment clause, the Court proceeds to bungle the dichotomy between claims of disparate treatment and claims of disparate impact. Normally, liability for disparate treatment arises when an employment policy has a "discriminatory motive," while liability for disparate impact arises when the effects of an employment policy "fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters*, 431 U. S., at 336, n. 15. In the topsy-turvy world created by today's decision, however, a pregnant woman can establish disparate *treatment* by showing that the *effects* of her employer's policy fall more harshly on pregnant women than on others (the policies "impose a significant burden on pregnant workers," *ante,* at 21) and are inadequately justified (the "reasons are not sufficiently strong to justify the burden," *ibid.*). The change in labels may be small, but the change in results assuredly is not. Disparate-treatment and disparate-impact claims come with different standards of liability, different defenses, and different remedies. *E.g.,* 42 U. S. C. §§1981a, 2000e–2(k). For example, plaintiffs in disparate-treatment cases can get compensatory and punitive damages as well as equitable relief, but plaintiffs in disparate impact cases can get equitable relief only. See §§1981a, 2000e–5(g). A sound reading of the same-treatment clause would preserve the distinctions so carefully made elsewhere in the Act; the Court's reading makes a muddle of them.

But (believe it or not) it gets worse. In order to make sense of its conflation of disparate impact with disparate treatment, the Court claims that its new test is somehow "limited to the Pregnancy Discrimination Act context," yet at the same time "consistent with" the traditional use of circumstantial evidence to show intent to discriminate in

Title VII cases. *Ante,* at 22. A court in a Title VII case, true enough, may consider a policy's effects and even its justifications—along with "'all of the [other] surrounding facts and circumstances'"—when trying to ferret out a policy's motive. *Hazelwood School Dist.* v. *United States,* 433 U. S. 299, 312 (1977). The Court cannot possibly think, however, that its newfangled balancing test reflects this conventional inquiry. It has, after all, just marched up and down the hill telling us that the same-treatment clause is not (no-no!) "'superfluous, void, or insignificant.'" *Ante,* at 17–18. If the clause merely instructed courts to consider a policy's effects and justifications the way it considers other circumstantial evidence of motive, it *would* be superfluous. So the Court's balancing test must mean something else. Even if the effects and justifications of policies are not enough to show intent to discriminate under ordinary Title VII principles, they could (Poof!) still show intent to discriminate for purposes of the pregnancy same-treatment clause. Deliciously incoherent.

And all of this to what end? The difference between a routine circumstantial-evidence inquiry into motive and today's grotesque effects-and-justifications inquiry into motive, it would seem, is that today's approach requires judges to concentrate on effects and justifications to the exclusion of other considerations. But Title VII *already* has a framework that allows judges to home in on a policy's effects and justifications—disparate impact. Under that framework, it is *already* unlawful for an employer to use a practice that has a disparate impact on the basis of a protected trait, unless (among other things) the employer can show that the practice "is job related . . . and consistent with business necessity." §2000e–2(k)(1)(A)(i). The Court does not explain why we need (never mind how the Act could possibly be read to contain) today's ersatz disparate-impact test, under which the disparate-impact element gives way to the significant-burden criterion and

the business-necessity defense gives way to the sufficiently-strong-justification standard. Today's decision can thus serve only one purpose: allowing claims that belong under Title VII's disparate-impact provisions to be brought under its disparate-treatment provisions instead.

## IV

JUSTICE ALITO's concurrence agrees with the Court's rejection of both conceivable readings of the same-treatment clause, but fashions a different compromise between them. Under its approach, an employer may deny a pregnant woman a benefit granted to workers who perform similar tasks only on the basis of a "neutral business ground." *Ante,* at 10 (opinion concurring in judgment). This requirement of a "business ground" shadows the Court's requirement of a "sufficiently strong" justification, and, like it, has no footing in the terms of the same-treatment clause. As the concurrence understands the words "shall be treated the same," an employer must give pregnant workers the same accommodations (not merely accommodations on the same terms) as other workers "who are similar in their ability or inability to work." *Ante,* at 3–4. But the concurrence realizes that requiring the same accommodations to all who are similar in ability or inability to work—the only characteristic mentioned in the same-treatment clause—would "lead to wildly implausible results." *Ante,* at 6, n. 3. To solve this problem, the concurrence broadens the category of characteristics that the employer may take into account. It allows an employer to find dissimilarity on the basis of traits *other* than ability to work so long as there is a "neutral business reason" for considering them—though it immediately adds that cost and inconvenience are not good enough reasons. *Ante,* at 7. The need to engage in this text-free broadening in order to make the concurrence's interpretation work is as good a sign as any that its interpretation is wrong from

the start.

\*　　\*　　\*

My disagreement with the Court is fundamental. I think our task is to choose the best possible reading of the law—that is, what text and context most strongly suggest it conveys. The Court seems to think our task is to craft a policy-driven compromise between the possible readings of the law, like a congressional conference committee reconciling House and Senate versions of a bill.

Because Young has not established that UPS's accommodations policy discriminates against pregnant women relative to others of similar ability or inability, see *supra,* at 2, she has not shown a violation of the Act's same-treatment requirement. I would therefore affirm the judgment of the Court of Appeals for the Fourth Circuit.

# SUPREME COURT OF THE UNITED STATES

No. 12–1226

PEGGY YOUNG, PETITIONER *v.* UNITED PARCEL
SERVICE, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[March 25, 2015]

JUSTICE KENNEDY, dissenting.

It seems to me proper, in joining JUSTICE SCALIA's
dissent, to add these additional remarks.  The dissent is
altogether correct to point out that petitioner here cannot
point to a class of her co-workers that was accommodated
and that would include her but for the particular limita-
tions imposed by her pregnancy.  Many other workers
with health-related restrictions were not accommodated
either.  And, in addition, there is no showing here of ani-
mus or hostility to pregnant women.

But as a matter of societal concern, indifference is quite
another matter.  There must be little doubt that women
who are in the work force—by choice, by financial necessity,
or both—confront a serious disadvantage after becom-
ing pregnant.  They may find it difficult to continue to
work, at least in their regular assignment, while still
taking necessary steps to avoid risks to their health and
the health of their future children.  This is why the diffi-
culties pregnant women face in the workplace are and do
remain an issue of national importance.

"Historically, denial or curtailment of women's employ-
ment opportunities has been traceable directly to the
pervasive presumption that women are mothers first, and
workers second." *Nevada Dept. of Human Resources* v.
*Hibbs*, 538 U. S. 721, 736 (2003) (quoting The Parental

and Medical Leave Act of 1986: Joint Hearing before the Subcommittee on Labor–Management Relations and the Subcommittee on Labor Standards of the House Committee on Education and Labor, 99th Cong., 2d Sess., 100 (1986)). Such "attitudes about pregnancy and childbirth . . . have sustained pervasive, often law-sanctioned, restrictions on a woman's place among paid workers." *AT&T Corp.* v. *Hulteen*, 556 U. S. 701, 724 (2009) (GINSBURG, J., dissenting). Although much progress has been made in recent decades and many employers have voluntarily adopted policies designed to recruit, accommodate, and retain employees who are pregnant or have young children, see Brief for U. S. Women's Chamber of Commerce et al. as *Amici Curiae* 10–14, pregnant employees continue to be disadvantaged—and often discriminated against—in the workplace, see Brief of Law Professors et al. as *Amici Curiae* 37–38.

Recognizing the financial and dignitary harm caused by these conditions, Congress and the States have enacted laws to combat or alleviate, at least to some extent, the difficulties faced by pregnant women in the work force. Most relevant here, Congress enacted the Pregnancy Discrimination Act (PDA), 42 U. S. C. §2000e(k), which defines discrimination on the basis of pregnancy as sex discrimination for purposes of Title VII and clarifies that pregnant employees "shall be treated the same" as non-pregnant employees who are "similar in their ability or inability to work." The PDA forbids not only disparate treatment but also disparate impact, the latter of which prohibits "practices that are not intended to discriminate but in fact have a disproportionate adverse effect." *Ricci* v. *DeStefano*, 557 U. S. 557, 577 (2009). Congress further enacted the parental-leave provision of the Family and Medical Leave Act of 1993, 29 U. S. C. §2612(a)(1)(A), which requires certain employers to provide eligible employees with 12 workweeks of leave because of the birth of

a child. And after the events giving rise to this litigation, Congress passed the ADA Amendments Act of 2008, 122 Stat. 3553, which expands protections for employees with temporary disabilities. As the parties note, Brief for Petitioner 37–43; Brief for Respondent 21–22; Brief for United States as *Amicus Curiae* 24–25, these amendments and their implementing regulations, 29 CFR §1630 (2015), may require accommodations for many pregnant employees, even though pregnancy itself is not expressly classified as a disability. Additionally, many States have enacted laws providing certain accommodations for pregnant employees. See, *e.g.,* Cal. Govt. Code Ann. §12945 (West 2011); La. Rev. Stat. Ann. §23:342(4) (West 2010); W. Va. Code Ann. §5–11B–2 (Lexis Supp. 2014); see also *California Fed. Sav. & Loan Assn.* v. *Guerra*, 479 U. S. 272 (1987) (holding that the PDA does not pre-empt such statutes). These Acts honor and safeguard the important contributions women make to both the workplace and the American family.

Today the Court addresses only one of these legal protections: the PDA's prohibition of disparate treatment. For the reasons well stated in JUSTICE SCALIA's dissenting opinion, the Court interprets the PDA in a manner that risks "conflation of disparate impact with disparate treatment" by permitting a plaintiff to use a policy's disproportionate burden on pregnant employees as evidence of pretext. *Ante,* at 8; see *ante,* at 21–22 (opinion of the Court). In so doing, the Court injects unnecessary confusion into the accepted burden-shifting framework established in *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973).

With these remarks, I join JUSTICE SCALIA's dissent.