In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1235

CONNIE J. ORTON-BELL,

*Plaintiff-Appellant,*

*v.*

STATE OF INDIANA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 11-CV-805 — **William T. Lawrence**, *Judge.*

ARGUED DECEMBER 10, 2013 — DECIDED JULY 21, 2014

Before MANION, ROVNER, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge*. Connie J. Orton-Bell was employed as a substance abuse counselor at a maximum security prison in Indiana. An investigator, who had been looking for security breaches, discovered that night-shift employees were having sex on Orton-Bell's desk and informed her. That investigator told her that he was not concerned about night-shift staff having sex but suggested she should probably wash off her desk every morning. When the situation was brought to the

superintendent's attention, he agreed and said that, as long as inmates were not involved, he was not concerned either. Immediately thereafter, the superintendent discovered that Orton-Bell was having an affair with the Major in charge of custody (which, ironically enough, allegedly involved sex on his desk) and both were terminated. Both separately appealed their terminations to the State Employees' Appeals Commission. The prison settled the Major's appeal and then called him to testify against Orton-Bell at her appeal. This tactic enabled the Major to keep all of his benefits, including his pension, to quickly get unemployment benefits, and to subsequently begin working at the prison as a contractor. Orton-Bell was not afforded similar benefits and opportunities, so she filed this suit alleging Title VII claims of sex discrimination, retaliation, and hostile work environment. The district court granted summary judgment to the state, concluding that Orton-Bell was not similarly situated to the Major, that she failed to prove retaliation under either the "direct" or "indirect" methods, and that the sexual tenor of the prison's work environment was not severe or pervasive enough to qualify as hostile. We reverse with regard to Orton-Bell's discrimination and hostile environment claims, but affirm with regard to her retaliation claims.

## I. Factual Background

After earning her bachelor's degree in psychology from Ball State University in 2006, Connie J. Orton-Bell began working as a behavioral clinician with at-risk children. In 2007, she was hired as a Substance Abuse Counselor ("counselor") for a contractor at the Pendleton Correctional Facility, a maximum security prison in Pendleton, Indiana. In 2008, she was hired by

the Indiana Department of Corrections ("DOC") and continued working as a counselor at Pendleton.

The official in charge of Pendleton at the time Orton-Bell was hired was Superintendent Brett Mize. According to Orton-Bell, he told her to come to department-head meetings, though it was not necessary, so that he could "look down the table at her." She claims she was not the sole object of his interest because "a good share of attractive women were there," though there was no apparent reason for them to be. Mize also said that, though other employees could wear jeans on Friday, she could not "because her ass looked so good that she would cause a riot." Without further specifics, Orton-Bell asserts that such sexual statements by Mize were commonplace. Mize was fired before the events that precipitated this suit took place.

However, according to Orton-Bell, the pervasive sexual comments that permeated the prison workplace extended beyond Superintendent Mize's admittedly outrageous behavior. Orton-Bell testified that similar sorts of comments were made by nearly all male employees and almost all the time. The workplace was "saturated" with sexual comments that constantly "bombarded" Orton-Bell and other female prison employees. "From the second you walk into that building, that is all you are hearing until the second you leave. And if you meet somebody on the parking lot, you are going to still hear it. So it's 100 percent of the time." For example, male employees would congregate around the pat-down area to watch female employees receive pat-downs on their way into the facility. Orton-Bell Dep. at 96. Pat-downs took place in full view of this crowd of onlookers; when Orton-Bell asked to be patted down in a private room, her request was denied. *Id*. at

94. Male employees would make sexual comments about female employees as they were patted down. *Id*. at 96–97. Women were patted down more thoroughly than men so that the male employees could watch. *Id*. at 92–93. Male employees frequently commented that they needed a cigarette after watching Orton-Bell get patted down because it was almost like having sex for them. *Id*. at 96. Orton-Bell described the experience of working in the prison as "an onslaught." *Id*. at 97.

Orton-Bell also describes an instance where she was asked to remove a sweater, which revealed her camisole.[1] After she complained, staff were directed not to order the removal of similar sweaters, and Orton-Bell does not say that particular problem reoccurred.

But inappropriate conduct at the facility was not limited to verbal banter. Orton-Bell became involved in an affair with Major Joe Ditmer, a 25-year veteran of the DOC who was in charge of custody at Pendleton. Both of them were married to other people, but both were separated from their spouses at the time. Orton-Bell and Ditmer would have sex at her home, which was nearby, on their lunch breaks. They used their work email accounts to schedule their rendezvous (in addition to participating in extensive sexually explicit conversations about sexual positions, preferences, and games). The superintendent at the time, Alan Finnan, began to have suspicions about

---

[1]  Her camisole was a "spaghetti strap" top that showed her arms but was otherwise like a t-shirt. In her words, "[i]t goes longer so that when you are bending over, there is no chance of … any skin showing. [Also, i]t goes higher than the bra, so if you bend over again, the chances of you showing something is just – it's nonexistent." Orton-Bell Dep. at 95.

Orton-Bell and Ditmer having a relationship (Superintendent Mize had already been fired for having an affair with a staffer from the hospital infirmary). Finnan believed Orton-Bell and Ditmer's affair was a violation of the State Code of Ethics and the DOC's Standards of Conduct.[2]

On Thursday, March 4, 2010, Finnan contacted Investigator Todd Tappy with Internal Affairs to open an investigation into Ditmer and Orton-Bell. Finnan also asked Captain Karl Downey about Orton-Bell and Ditmer, and he informed Finnan that Ditmer had admitted to having sexual intercourse and oral sex in his office. On Saturday, March 6, 2010, Tappy and another investigator, Michael Rains, reviewed Orton-Bell and Ditmer's work email accounts and discovered numerous sexually explicit emails.

But this was not the only ongoing investigation. Earlier (we have not been told the exact date), Orton-Bell and a counselor she supervised, Diane Ripberger, complained that it appeared people had been using their desks at night. Terry Silvers, yet another Internal Affairs Investigator, looked into those complaints, and into whether there had been any unauthorized access to their computers. His investigation revealed no unauthorized access to their computers, but he was able to

---

[2] The Code of Ethics requires employees to maintain "high standards of honesty, integrity and impartiality," "mutual respect and professional cooperation in … relationships with other staff members," and to "conduct [themselves], whether on-duty or off-duty, in a manner that will not bring dishonor or disrepute to the [DOC] or the State of Indiana," R. 32, Ex. M at 4, and the Standards of Conduct require staff to "conduct themselves at all times so as to reflect favorably on the Department." R. 32, Ex. M at 11.

determine that their desks were being used by night-shift employees for sexual liaisons. Orton-Bell recollected that she had cleaned mysterious stains off her desk in the past. Orton-Bell Dep. at 166. Understandably outraged, Orton-Bell asked Silvers what they ought to do next, to which he replied, "I suggest you wash off your desk every day." Orton-Bell Dep. at 125. Unsurprisingly not satisfied by that solution, Orton-Bell protested, but Silvers stated, "This is a max[imum] security prison, staff having sex is no concern to us. As long as it is not staff and offender we don't care." *Id*. After that, on Thursday, March 4, 2010, Orton-Bell discovered at a meeting that many other employees knew her office was used for sex, and that everyone thought it was quite funny. After learning that people at the facility were treating this disturbing use of her workspace as a joke, she complained to Superintendent Finnan and Investigator Silvers the next day. Silvers acknowledged that he knew it was a huge joke that her office was being used for sex all the time, and Superintendent Finnan said he did not care as long as offenders were not involved.[3]

Returning to the investigation of Orton-Bell and Ditmer's affair, Orton-Bell and Ditmer were interviewed on Monday, March 8, 2010. Both Orton-Bell and Ditmer admitted to having a sexual relationship, that it had involved conversations using their work email accounts, and that they had engaged in sexual

---

[3] This occurred after Finnan had launched the investigation into Orton-Bell and Ditmer's affair. Apparently, Finnan's concern about conduct that would reflect badly on and "bring dishonor or disrepute" to the prison or Indiana did not extend to the night shift.

intercourse in Ditmer's office. Orton-Bell insists that she only admitted to this after she was told that hugging and kissing constituted sexual intercourse, and that was all she meant. (And because we are reviewing a grant of summary judgment to the state, we accept her statement as true.) Ditmer had no such qualifications, and admitted to actual sexual intercourse and oral sex in his office. The administration at Pendleton believed that this was "conduct that would interfere with the staff member's ability or fitness to effectively perform require[d] duties" in violation of the DOC Standards of Conduct. R. 32, Exs. A, M. The next day, Orton-Bell and Ditmer both received notice that they were suspended until April 7, 2010, and terminated effective April 8, 2010.

Both Ditmer and Orton-Bell appealed their terminations to the State Employees' Appeals Commission ("SEAC"). Ditmer's appeal ended with a "Final Order of Settlement and Dismissal." This enabled Ditmer to resign in good standing, keep all the benefits he had earned, including his pension, and to continue working at the prison as a contractor. Orton-Bell's appeal was not successful. It went to a hearing, where Ditmer testified against her, and the presiding officer determined that her termination was correct. She took the process "all the way to the end," but did not obtain a favorable resolution and ended up with nothing. Orton-Bell Dep. at 110, 133. As a result of the different characterizations of their terminations, Orton-Bell even had significant difficulty obtaining unemployment benefits. The unemployment office asked for more information regarding her termination, and when the DOC representative responded that Orton-Bell had "admitted inappropriate contact with [an] employee," her application for benefits was

denied. Throughout her brief, Orton-Bell tells us that her unemployment benefits were "delayed," so apparently she was able to obtain them eventually.

Orton-Bell brought this suit, alleging sex discrimination, retaliation, and hostile work environment claims under Title VII against Indiana. Indiana moved for summary judgment, which the district court granted. The district court concluded that Orton-Bell had not offered any evidence that there was a similarly situated employee from whom she was treated differently—which defeated both her sexual discrimination and retaliation claims—and that she had not proven that the circumstances of her work environment were sufficiently severe or pervasive to rise to the level of a hostile work environment. Orton-Bell appeals.

## II. Discussion

We review the district court's summary judgment ruling *de novo*. *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005). Summary judgment is warranted if the evidence, when viewed in the light most favorable to the non-moving party, presents "no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Id.* at 773.

Orton-Bell's discrimination and retaliation claims may be supported by both "direct" and "indirect" evidence and may

be analyzed under both a "direct" and an "indirect" method. Orton-Bell attacks this dual dichotomy, saying we should just look at the "totality of the evidence" and not "divid[e] the evidence into separate types of evidence and separate methods." Members of this court have bemoaned the "snarls and knots" of our Title VII jurisprudence. *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring).[4] But, while these observations have some merit, the law remains the same. While all relevant direct *and* circumstantial evidence is considered (in its "totality") in *both* methods, we do indeed consider the "direct" and "indirect" methods separately when reviewing summary judgment because we are not "authorized to abjure a framework that the Supreme Court has established." *Green v. Am. Fed'n of Teachers/Ill. Fed'n of Teachers Local 604*, 740 F.3d 1104, 1106 (7th Cir. 2014). Of course, we should not lose sight of the fact that both methods are directed at the "fundamental question at the summary judgment stage[, which] is simply whether a reasonable jury could find prohibited discrimination." *Bass v. Joliet Pub. Sch. Dist. No. 86*, No. 13-1742, 2014 WL 1229578, at *4 (7th Cir. Mar. 26, 2014). But because of the difficulty of proving the employer's intent "directly," the "indirect" method merely gives plaintiffs a "leg up" by (in the absence of evidence to the contrary) creating a presumption that an employer's decision was motivated by "the unlawful [reason] alleged by the plaintiff," if the plaintiff can meet the lower threshold of proving a *prima facie* case. *Gacek v. Am.*

---

[4]  Indeed, we spare juries the confusion. The "direct" and "indirect" methods "are for the judge, not the jury." *Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997).

*Airlines, Inc.*, 614 F.3d 298, 301–03 (7th Cir. 2010); *see Coleman*, 667 F.3d at 845. Given that so much of Orton-Bell's case focuses on her hostile work environment claim premised on night-shift staff using her and her female subordinate's desks for sex, we begin there.

### A. Hostile Work Environment

"Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013). This doctrine finds its textual grounding in the language of the statute: "It shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to [her] … terms [or] conditions … of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a). As such, to avoid summary judgment on a hostile work environment claim, a plaintiff must establish four elements: "(1) the work environment must have been both subjectively and objectively offensive; (2) her gender must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014) (citing *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 383 (7th Cir. 2012)).

Orton-Bell argues that she has offered sufficient evidence of these elements via testimony of the incident involving night-shift staff having sex on her desk and of an unending barrage of sexually charged comments made to her. As we explain below, there is sufficient evidence of the latter for her hostile work environment claim to survive summary judgment. However, because Orton-Bell relies heavily on the sex-on-the-

desk incident, we first explain why she has failed to prove that incident meets all the elements.

1. "Sex on the Desk" Incident

Orton-Bell has shown that night-shift staff having sex on her desk was subjectively offensive, and we agree entirely that it is objectively offensive and severe. It was also pervasive because it was revealed to her that, for some time, she had been working at a desk un-sanitized after being used as a platform for sex by night-shift employees. And her supervisors' admitted deliberate indifference is enough for a jury to find the fourth element satisfied. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013) (noting that negligence is sufficient to satisfy this element). The difficulty is Orton-Bell's proving the second element, that her gender caused the harassment. She had to show that the night-shift employees had sex on her desk, and that the investigator told her to clean it up and the supervisor did not intervene *because Orton-Bell was a woman.*

> [H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). However, "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connota-

tions, but actually constituted '*discrimina[tion]* … because of … sex.'" *Id.* at 81 (emphasis and modification in original); *see also Holman v. Indiana*, 211 F.3d 399, 402-03 (7th Cir. 2000) (reiterating this point in *Oncale's* holding).

The notion that night-shift staff had sex on her desk *because* she was a woman is pure speculation. The only evidence of any motive held by the night-shift staff (who have not been identified) for having sex on her desk is that her office had curtains and was in a lockable suite near the infirmary, but accessible with the master key that a night-shift lieutenant would have. Orton-Bell Dep. at 167. Likewise, there is no evidence that Investigator Silvers's comment that she should clean her desk every morning, and Superintendent Finnan's comment that he did not care as long as offenders were not involved, was based on her being a woman.[5] Those comments are not inherently sex-based, nor do they evince either attraction or "hostility" to Orton-Bell on account of her being a woman in the workplace. If there were evidence that the night-shift staff were using her office because she was a woman, and her supervisors were indifferent, that would be enough. If there was evidence that night-shift staff similarly used a man's office, and her supervisors intervened in that circumstance but not in her circumstance, that would be enough. There is

---

[5] If those who had made harassing comments based on sex were the same people who engaged in sex on Orton-Bell's desk at night, or were the same supervisors who ignored her complaint, an inference of discriminatory motive might be reasonable. But that is not the case here. There is neither any evidence of who the night-shift staff were and whether they made such comments, nor is there any evidence that Finnan or Silvers had made harassing comments.

neither. Her supervisors' insensitive and inattentive responses were callous mismanagement; but absent evidence that this inaction was based on her sex, it did not violate Title VII.

Counsel for Orton-Bell makes a comment in her brief that reflects a fundamental misunderstanding of the law. Counsel states: "The State implies that the complaint of Orton-Bell about employees having sex on her desk and being told to wash down her desk every morning does not relate to the hostile work environment based on sex. It is hard to imagine how it would not relate to sex. The very word 'sex' was the central part of the complaint." This is an equivocation. The conduct was certainly sexual *intercourse* on her desk, but that does not mean that night-shift staff had sexual intercourse on Orton-Bell's desk because she was of the *female* sex. There is no evidence to indicate that, had her conveniently private and secure, but accessible, office belonged to a man, it would not have been used in the same manner. *See, e.g.*, *Shermer v. Illinois Dep't of Transp.*, 171 F.3d 475, 478 (7th Cir. 1999) (holding that evidentiary void as to motive for making, and details of, offensive comments doomed Title VII claim). Accordingly, this incident, while egregious, does not support a hostile work environment claim.

2. Sexually-Charged Comments and Treatment

The constant barrage of sexually charged comments, however, was clearly pervasive, offensive, and based on Orton-Bell's sex. We also conclude that there is enough evidence for a jury to find that it was severe, subjectively offensive, and that there is a basis for holding the state liable.

Superintendent Mize, the official formerly in charge of the entire prison, harassed her, ogled her, and ostensibly forbade her from wearing jeans based on his opinion that "her ass looked so good that it would cause a riot." Walking through the pat-down area, she says she was searched more thoroughly while men watched and made sexual comments. And she relays that these kind of comments were not rare, but were part of a never-ending barrage. We have found less egregious comments in less egregious contexts to be sufficiently severe. *See, e.g., Boumedi v. Plastag Holdings*, LLC, 489 F.3d 781, 786 (7th Cir. 2007) (reversing summary judgment for employer; at least 18 sex-based comments made over ten months could show hostile work environment); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675–76 (7th Cir. 1993) (affirming verdict for plaintiff; referring to plaintiff by a racial slur between five and ten times during his employment created actionable hostile work environment). And while "[t]he occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable," *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 977 (7th Cir. 2004), these comments were perpetual and directed at Orton-Bell.

With regard to subjective offensiveness, Orton-Bell testified that this environment was oppressive and interfered with her ability to do her job. Regardless, the district court held that Orton-Bell had not shown that the environment was subjectively offensive. The record does reveal an instance where, in an email conversation with a co-worker named Bruce Helming, she participated in vulgar banter. However, while that may lead a jury to conclude that she was not subjectively offended

by the environment, one private conversation via email is not enough for us to conclude, as a matter of law, that she was not subjectively offended by the many other public, unwelcome sexually charged comments in the environment.

Finally, we address whether there is a basis for employer liability.

> When no tangible employment action is taken against the employee in the course of the harassment, an employer may raise an affirmative defense to liability that must be proved by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Passananti v. Cook Cnty.*, 689 F.3d 655, 670 (7th Cir. 2012). Orton-Bell complained to Assistant Superintendent Kathy Griffin about the constant sexual comments at the facility. Orton-Bell Dep. at 91. Orton-Bell reported directly to Griffin, *id*. at 52, so her complaints complied with the state's Sexual Harassment Policy, which allows employees to report complaints "to supervisors or agency heads." Defendants' Statement of Undisputed Material Facts at p. 4 (¶ 20). Orton-Bell's evidence shows that no corrections were made. She made repeated complaints about the constant sexual comments, including complaints to the right individuals, but nothing

changed. This is enough for a jury to find this element satisfied (and the defense inapplicable).

Accordingly, because Orton-Bell has offered enough evidence of every element of her hostile work environment claim for a jury to find in her favor, it was error to grant summary judgment on that claim.

## B. Retaliation

Orton-Bell also argues that her termination and the different treatment she received in relation to her termination were in retaliation for protected activity, complaining of sex discrimination.[6] Specifically, complaining that night-shift employees were having sex on her desk.[7] However, a "complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. … Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citing *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997)). Orton-Bell's complaint to Finnan was that the night-shift staff was using her desk for sex—an undoubtedly

---

[6] Retaliation claims are also treated under both a "direct" and an "indirect" method, but both methods depend on the plaintiff proving that she engaged in a protected activity. *Coleman*, 667 F.3d at 859 (including this element in the "indirect" method); *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008) (same for the "direct" method).

[7] Orton-Bell made other complaints, but she bases her retaliation claim solely on her complaint about sex on her desk.

valid complaint. But Orton-Bell has not provided any evidence that she rooted her complaint in the fact that she was a woman—which is what is required. Neither were the facts "sufficient to create that inference." The conduct was disgusting, but that night-shift employees were using a conveniently private, secure yet accessible office for sex does not indicate that they were doing so because the office's daytime occupant was a woman. And nothing that Orton-Bell said to Finnan indicated that she was complaining of sex discrimination. Accordingly, although the district court did not reach this ground, its grant of summary judgment to Indiana on the retaliation claim was correct because Orton-Bell has failed to establish an essential element of this claim under both the "direct" and "indirect" methods, namely that she had engaged in a protected activity.

### C. Sex Discrimination

Title VII forbids an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2. Because we conclude that Orton-Bell has presented enough evidence to survive summary judgment under the "indirect" method, we do not address the direct method.

To establish a *prima facie* case, Orton-Bell must establish that "(1) she is a member of a protected class, (2) her job performance met [her employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *Burks v.*

*Wis. Dep't of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006). Where an employee who failed to meet expectations claims that she has been treated differently from a male employee who similarly failed to meet expectations, the second element merges into the fourth. *See, e.g., Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (merging the elements "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner"). Here, Orton-Bell is a woman and was terminated for misconduct, so the controversy is centered on the fourth element.

In general, a plaintiff who believes another individual is "similarly situated" must at least show that this "comparator" (1) "dealt with the same supervisor," (2) "w[as] subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *Coleman*, 667 F.3d at 847 (citing *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). Although in different branches of the chain of command, Orton-Bell and Ditmer were both fired by the same ultimate supervisor (Finnan) for the same conduct in violation of the same standards.

The only question is whether there are "differentiating or mitigating circumstances as would distinguish" the DOC's treatment of Orton-Bell. Orton-Bell and Ditmer are primarily differentiated by the fact that she was a counselor of two years and he was a twenty-five-year veteran of the DOC's Custody branch. But this cuts both ways. Maybe the DOC was generous with Ditmer because of his long career. But that also put him in a position to know better. Thus his offense was also worse.

Ditmer violated the DOC's standards of conduct while in the sensitive leadership position of Major in Charge of Custody (a para-military leadership role); Orton-Bell was a substance abuse counselor. If there is any dissimilarity, it is that the affair compromised Ditmer's ability to perform his job far more than it compromised Orton-Bell's ability to perform hers. And unlike Orton-Bell, this was not Ditmer's first work affair. Ripberger Aff. at 2; Orton-Bell Dep. at 188–89. Accordingly, because judging comparators is a common-sense inquiry, and Orton-Bell and Ditmer were fired by the same supervisor for the same conduct that violated the same standard—and both appealed the termination—we conclude that for the purposes of this claim, Ditmer is similarly situated.

Further, they were certainly treated differently— Orton-Bell was terminated and was banned from working in any capacity for the DOC. Ditmer, however, was able to enter into a settlement agreement that permitted him to resign, enabled him to keep all his benefits including his pension, and allowed him to work at the prison with an outside contractor (which he did).[8] The DOC seems to have acquiesced to those outcomes as the results of the SEAC appeal process. But the disparity of

---

[8] Ditmer also got his unemployment benefits without any delay, unlike Orton-Bell. This stemmed in part from the fact that the DOC provided more detail about Orton-Bell's misconduct as a result of her being terminated instead of being allowed to resign like Ditmer. Thus, even though the unemployment determinations were made by different officers, the DOC provided different information stemming from its previous different treatment of Orton-Bell and Ditmer. So, while there is no evidence the unemployment office discriminated, the harm from the delay does tie back to the DOC's alleged discrimination.

consequences was the effect of the DOC's willingness to settle with Ditmer but not with Orton-Bell. The DOC hints that this was caused by different litigation strategies, but it fails to provide any reason it did not offer Orton-Bell the same settlement terms it gave Ditmer. In fact, Orton-Bell testified that she asked Ditmer about his settlement but Ditmer responded that he could not talk to her because of the settlement. Orton-Bell Dep. at 162. The DOC, focusing on its argument that Ditmer and Orton-Bell were neither similarly situated nor treated differently, has not seriously offered a reason for their disparate treatment. Even if we were to infer the reason that the DOC hints at—that it was merciful to Ditmer because of his long career—Orton-Bell has offered sufficient evidence of pretext. Firing the Major in Charge of Custody for an affair which compromised his ability to lead (especially given his repeated past violations of the conduct code) makes sense. But letting him resign and retain the ability to keep working (with all attendant benefits) while firing the female counselor with whom he had an affair is suspect. This conclusion results in large part from the failure of the parties to develop the record more about the SEAC process and the DOC's decision to settle with Ditmer. Indeed, there was so little development below that the district court missed the fact that Orton-Bell had even appealed. Based on the evidence currently available, we conclude that the discrimination aspect of this suit must go forward, but more discovery is needed on these issues.

### III. Conclusion

Because there is evidence that Orton-Bell was similarly situated to Ditmer, but treated less favorably, it was error to grant summary judgment on her discrimination claim. Further,

because her supervisors failed to remedy the severely sexualized climate at the prison, it was likewise error to grant summary judgement on her hostile work environment claim. However, because she has failed to show that her complaint about night-shift employees having sex on her desk was rooted in her protected status, it was not a protected complaint, so her retaliation claim fails. Accordingly, we AFFIRM IN PART and REVERSE IN PART and REMAND for further proceedings consistent with this opinion.