In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2622

ROBERT E. SMITH and
JOSEPH A. BALDI, Trustee,

*Plaintiffs-Appellants*,

*v.*

CHICAGO TRANSIT AUTHORITY,

*Defendant-Appellee*.

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10-cv-1585 — **Sharon Johnson Coleman**, *Judge*.

———————

ARGUED DECEMBER 10, 2014 — DECIDED NOVEMBER 23, 2015

———————

Before EASTERBROOK, SYKES, and HAMILTON, *Circuit Judges*.

SYKES, *Circuit Judge*. Robert Smith alleges that the Chicago Transit Authority ("the CTA") fired him because of his race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The CTA says it fired Smith because he violated its policy against sexual harassment. The district court granted summary judgment for the CTA, con-

cluding that Smith's case failed under the direct and indirect methods of proof. We affirm.

## I. Background

Smith, who is black, began working at the CTA in 1986. In the fall of 2006, he held the position of Transportation Manager and was assigned to the Bus Services Management unit, which was responsible for the movement of buses and monitoring bus service in the field.

The CTA has a policy prohibiting sexual harassment, including "[u]nwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" when the "conduct has the … effect of … creating an intimidating, hostile or offensive work environment." The CTA's EEO Unit is tasked with investigating sexual-harassment complaints brought to its attention. Operations managers who learn of sexual-harassment allegations are required to pass them on to the EEO Unit. Managers are instructed to collect written statements from the employees involved in the complaint and submit them to the EEO staff for investigation. An EEO staff member then investigates the complaint and prepares a report. Based on a review of the investigator's file and report, the general manager of the EEO Unit determines whether the accused employee violated the sexual-harassment policy. All disciplinary decisions, however, are made by department managers; the EEO Unit has no disciplinary authority.

On November 6, 2006, bus operator Marcella McCall reported that on October 28 Smith asked her to perform a striptease for his wife and to join him and his wife in a sexual relationship. He repeated the proposition the next day. At

the time Smith was McCall's supervisor, so she reported these incidents to another manager who forwarded the complaint to the EEO Unit. Pamela Beavers was the general manager of the unit, and she had three staff members: Thelma Crigler, Alenda Young, and Salvador Ramirez. (Beavers, Crigler, and Young are black; Ramirez is Hispanic.) Young was assigned to investigate McCall's report.

Young began by interviewing McCall and Robert McCullough, a bus supervisor who was working with McCall on the dates in question. Young also interviewed Smith, and she quickly recognized him from a prior unwelcome encounter. According to Young, on this earlier occasion Smith approached her for no apparent work-related reason, told her she "looked lonely," and asked her to lunch. This made her uncomfortable, but she completed the interview anyway and then handed the matter off to Ramirez, who took over as lead investigator.

During Young's interview with Smith, he told her that on October 28 he had allowed McCall to sit in his truck when she was cold, but he said there hadn't been any sexual talk between them on either of the dates in question. Smith told Young that he thought McCall made up the sexual-harassment story to cover for leaving work early on October 29.

Ramirez completed the investigation and prepared a report concluding that Smith had violated the CTA's sexual-harassment policy. The report included summaries of various employee interviews, including one with a second female employee who also accused Smith of inappropriate sexual remarks. Ramirez explained that his conclusion was

> based on the following information: McCullough stated that he saw both Smith and McCall in the truck together for approximately 20 minutes; McCall made a contemporaneous complaint regarding Smith's unwelcome conduct; Smith's incongruous account of the incident with McCall is contradicted by his behavior subsequent to his observance of her as a manager with suspicion of her misconduct. Also, Smith's forward and aggressive approach of an identified EEO Officer [Young] gives example of his proclivity for inappropriate workplace behavior toward female coworkers.

Ramirez recommended that "corrective action" be taken by the appropriate operations unit. The report also noted that "Smith will be counseled by the EEO[] Unit on what actions would be in his best interest to prevent inappropriate actions, or claims of retaliation, in the future." Beavers approved the report on December 18.

Responsibility for any disciplinary action fell to William Mooney, the vice president of bus operations at the CTA, who oversaw about 164 managers, including Smith. After receiving the report from the EEO Unit, Mooney asked Walter Thomas, the general manager of Bus Service Management, to investigate further. Thomas interviewed Smith and asked the CTA's lawyers for advice on whether the EEO Unit investigation had been properly completed. (He apparently didn't have direct access to many of the EEO Unit's materials or staff.) This additional investigation didn't turn up anything to refute the EEO Unit's findings, so Thomas and Mooney concluded that Smith had indeed violated the

sexual-harassment policy. On January 24, 2007, Mooney fired Smith, citing (among other reasons) the violation of the CTA's sexual-harassment policy.

Smith filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that he was fired because of his race. The EEOC investigated and issued a Right to Sue letter on December 10, 2009. Smith then filed a pro se complaint against the CTA in federal court. Smith had filed for bankruptcy earlier in 2009, so Joseph A. Baldi, the bankruptcy trustee, intervened in the action.

Smith eventually obtained counsel, who twice amended the complaint. The latest version alleges that the CTA fired Smith because of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981, and that the CTA defamed him by speaking about the circumstances of his discharge to the *Chicago Tribune*.

Following discovery, the CTA moved for summary judgment. The CTA argued that the defamation claim was time-barred. Smith didn't contest that argument, and he says nothing more about this claim here, so we don't need to address it further. Regarding the two discrimination claims, Smith argued that he had enough evidence to get to a jury. The district court disagreed, concluding that Smith's evidence was insufficient to create a triable issue under either the direct or indirect methods of proving unlawful discrimination. Accordingly, the court granted the CTA's motion. This appeal followed.

## II. Discussion

We review the district court's order granting summary judgment de novo, construing the evidence and drawing all

reasonable inferences in Smith's favor. *See Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012). The legal analysis for discrimination claims under Title VII and § 1981 is identical, so we merge our discussion of the two claims. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013).

At the summary-judgment stage, claims of employment discrimination are evaluated under the "direct" method of proof or the "indirect" method of proof announced in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), depending on the kind of evidence the plaintiff presents in opposition to the motion. The "direct" method is a bit of a misnomer: it simply refers to anything *other than* the *McDonnell Douglas* indirect approach. Under the direct method of proof, the plaintiff can defeat summary judgment by presenting sufficient direct evidence of the employer's discriminatory intent or "a convincing mosaic of circumstantial evidence … that point[s] directly to a discriminatory reason for the employer's action." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (internal quotation marks omitted). Examples of relevant circumstantial evidence include "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (internal quotation marks omitted).

The indirect method is a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence—evidence that similarly situated employees not in the plaintiff's protected class were treated better—would permit

a jury to infer discriminatory intent.[1] The plaintiff must first meet his burden of production on the familiar four-part test for establishing a prima facie case: (1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment. *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009). If the plaintiff does so, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* The burden then shifts back to the plaintiff to provide evidence establishing a genuine dispute about whether the employer's stated reason was a pretext for prohibited discrimination. "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) (internal quotation marks omitted). Summary judgment for the defendant is appropriate if the plaintiff fails to carry his burden to establish a prima facie case or is unable to show a genuine dispute about whether the neutral reason advanced by the employer was merely pretextual.

Taking a cue from some of our recent cases, Smith criticizes the direct and indirect approaches as too rigid and formalistic. *See, e.g.*, *Hitchcock v. Angel Corps, Inc.*, 718 F.3d

---

[1] This is purely a tool for summary-judgment analysis. "At the trial, as we have explained before, the burden-shifting process came to an end, and the only question was whether [the defendant] presented enough evidence to allow a rational jury to find that she was the victim of discrimination." *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 925 (7th Cir. 2000).

733, 737 (7th Cir. 2013) ("[W]e hasten to join in the growing chorus of opinions in this circuit, signed onto by a majority of active judges, that have expressed frustration with the confusing 'snarls and knots' of this ossified direct/indirect paradigm, and that have suggested a more straight-forward analysis of whether a reasonable jury could infer prohibited discrimination."); *Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 514 (7th Cir. 2012) (similar); *Good*, 673 F.3d at 680 ("[T]he direct and indirect methods … have become too complex, too rigid, and too far removed from the statutory question of discriminatory causation.").

Even more recently, however, we've said that although "serious questions" have been raised about the utility of the established methods of proof, "litigants and courts still properly discuss racial discrimination claims … using the language of either the direct or indirect method[s] of proof." *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 789–90 (7th Cir. 2015). As long as the Supreme Court's precedents in this area are still good law, we're not authorized to abandon the established framework. *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) ("While all relevant direct *and* circumstantial evidence is considered (in its 'totality') in *both* methods, we do indeed consider the 'direct' and 'indirect' methods separately when reviewing summary judgment because we are not authorized to abjure a framework that the Supreme Court has established.") (internal quotation marks omitted). Indeed, the Supreme Court recently applied a variation of the *McDonnell Douglas* analysis to a claim of pregnancy discrimination—suggesting that the doctrine is here to stay. *See Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1353 (2015).

So we'll evaluate Smith's evidence under the direct and indirect methods, as the district court did, recognizing of course that "the continued focus [is] on whether the plaintiff has introduced sufficient evidence to give rise to an inference of *intentional* discrimination." *Id.* at 1355.

Generally speaking, an employer can only be liable under Title VII when the relevant decision-maker—here, Mooney—is shown to have acted with discriminatory intent. *See Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 378–79 (7th Cir. 2011). But there's no evidence that Mooney was himself racially biased, and indeed he replaced Smith with another black man. Smith's case can succeed only under the "cat's paw" theory, which holds an employer liable if the decision-maker was manipulated by another employee acting with discriminatory intent. *See, e.g., Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). The evidence suggests that Mooney fired Smith largely because of the EEO Unit's findings on McCall's sexual-harassment complaint, although he did conduct some additional investigation. Accordingly, we'll assume that Smith is right that he's entitled to a trial if his evidence shows that the EEO Unit tried to get him fired because of his race.

## A. Direct Method

We begin with the direct method. Smith asserts that the CTA had an unwritten policy that the EEO Unit had exclusive authority to investigate sexual-harassment complaints but routinely violated this policy by permitting the operations departments to conduct their own investigations when white employees were accused of harassment. Smith posits that investigations by the EEO staff were more rigorous than those conducted by operations managers, so that by allow-

ing white employees to escape the EEO Unit's scrutiny, the CTA intentionally discriminated against black employees. Smith argues that this is direct evidence of discriminatory intent because the EEO Unit investigated McCall's complaint against him.

The record contains some evidence of a general policy that the EEO Unit had exclusive authority to investigate and resolve sexual-harassment complaints. Ramirez testified that the EEO Unit is the "exclusive body … doing the investigations" of sexual-harassment complaints. Beavers said that although operations managers were encouraged to do their own interviews, the EEO Unit wouldn't rely on those interviews and would always conduct its own investigation.

But no evidence supports Smith's theory that the CTA regularly channeled investigations of white employees to the operations departments while keeping investigations of nonwhite employees under the auspices of the EEO Unit. It's undisputed that the EEO Unit was understaffed in 2006–2007, and some sexual-harassment investigations were conducted by managers in the operations department. Of the eight identified cases in which this occurred, however, four involved black employees and two involved Hispanics. A jury could not reasonably infer discriminatory intent from this evidence.

Nor is there any evidence to support Smith's theory that the operations departments went easy on employees when they investigated in the EEO Unit's place. And no evidence suggests that anyone in the EEO Unit was biased against Smith because of his race. Smith argues that Ramirez was trying to protect Cesar Lovera, McCall's boyfriend, who worked as a timekeeper at the CTA. Smith thinks McCall

made up the sexual-harassment story as a cover for leaving work early on October 29 and that Lovera helped her commit time-card fraud when she recorded her work hours that day. This conspiracy theory lacks evidentiary support. More to the point, the only apparent link between Ramirez and Lovera is that they're both Hispanic; Smith has no evidence suggesting that they harbored racial animus.

Finally, Smith points to what he thinks are failures in the investigative process. He claims, for example, that Young should have recused herself immediately rather than after taking his statement. He also argues that the EEO Unit should have interviewed a witness he identified and that its final report didn't adequately account for certain (minor) inconsistencies in McCall's story. It's true that "[s]ignificant, unexplained or systematic deviations from established policies or practices" can sometimes be probative of unlawful discriminatory intent. *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (internal quotation marks omitted). Here, however, Smith hasn't explained why these supposed infirmities in the investigative process support an inference of discriminatory intent. Smith's case fails under the direct method of proof.

**B. Indirect Method**

Smith's case also fails under the indirect method of proof. The parties haggle over whether Smith was meeting the CTA's legitimate expectations: The CTA says that Smith wasn't meeting expectations because he committed sexual harassment, while Smith says the sexual-harassment finding was just a pretext for discrimination. The debate doesn't matter. Smith hasn't identified a similarly situated employee who was accused of similar misconduct but was treated

more leniently. He points to only one managerial-level employee as a comparator: David Schaefer, a white manager who was assigned to the same terminal and was also accused of sexually harassing other employees on several occasions. But the record contains no further information about Schaefer. Smith doesn't tell us, for example, who Schaefer's supervisor was or what Schafer was accused of doing. We don't know the results of any sexual-harassment investigation, whether he was disciplined, and if so, what discipline was meted out. With such significant gaps in the evidentiary record, Smith plainly hasn't carried his burden of establishing a prima facie case of discrimination under the indirect method of proof.

AFFIRMED.