In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 15-3805
PAMELA D. FERRILL,

*Plaintiff-Appellant,*

*v.*

OAK CREEK-FRANKLIN JOINT
SCHOOL DISTRICT and
OAK CREEK-FRANKLIN JOINT
SCHOOL DISTRICT BOARD OF EDUCATION,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 13-cv-0858 — Lynn Adelman, *Judge.*

———————————

ARGUED JUNE 2, 2016 — DECIDED JUNE 19, 2017

———————————

Before POSNER and SYKES, *Circuit Judges*, and YANDLE, *District Judge*.*

SYKES, *Circuit Judge*. Pamela Ferrill was hired as the principal of Edgewood Elementary School in the Oak Creek-Franklin Joint School District for an initial two-year term with an automatic third-year rollover unless the Board of Education opted out. Ferrill is black; the school district serves two predominantly white suburbs on the southern edge of Milwaukee County. During her tenure as principal, the Edgewood staff had exceedingly low morale, and Ferrill was plagued with multiple performance complaints. Staff described her as confrontational, inconsistent in her treatment of her subordinates, and quick to accuse others of racism. The superintendent of schools hired a consultant to help improve Ferrill's performance, but that effort failed and the consultant bluntly recommended that Ferrill be removed.

When the time came to review the rollover of Ferrill's contract, the superindent recommended that the Board opt out. The Board accepted that recommendation. Ferrill found a new job, which the Board treated as a functional resignation of her position. She then sued the Board alleging claims of racial discrimination in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, and retaliation in violation of her rights under Title VII and the First Amendment. The district judge granted summary judgment for the Board on some of these claims. Other claims were tried to a

---

* Of the Southern District of Illinois, sitting by designation.

jury, which found for the Board after less than a half-hour of deliberation.

Ferrill concentrates her appeal on the judge's summary-judgment ruling rejecting her discrimination and retaliation claims related to the Board's decision to opt out of the third-year contract rollover. The judge's ruling was sound. Ferrill's shortcomings as Edgewood's principal were well documented and confirmed by an independent consultant, so she has not shown that she was meeting the Board's legitimate performance expectations and thus has not established a prima facie case of discrimination. The retaliation claim fails for lack of evidence connecting the Board's decision to activity protected by Title VII.

## I. Background

Edgewood Elementary School serves students in grades K–5 in the Oak Creek-Franklin Joint School District. In July 2008 Dr. Sara Burmeister, the district superintendent, hired Ferrill as Edgewood's principal for an initial term of two years. The contract contained an automatic rollover for an additional year unless the Board of Education opted out before January 31, 2010.

Ferrill's tenure as principal was turbulent. Edgewood was consistently plagued with low morale, the responsibility for which Ferrill attributes to others. Because we're reviewing a summary-judgment ruling, we describe the key events drawing reasonable inferences in Ferrill's favor.

In her first few months on the job, Ferrill learned that some of Edgewood's students—and even some parents—were referring to the bus that served a low-income neighborhood as the "ghetto bus." She also learned that some

white students were calling black students derogatory names. Ferrill addressed these problems at an October staff meeting and urged the teachers to be proactive about addressing racial issues with their students.

In early November two fifth-grade students, one of whom is black, started spreading a false story that certain teachers were having sex in the faculty lounge. Ferrill reprimanded the students, spoke with their parents, and then discussed the matter with the two teachers at the center of the rumormongering. The black student had confided to Ferrill that he was afraid his misbehavior would mean he would no longer be called on in class. When Ferrill brought this concern to the attention of one of the wrongly accused teachers, the teacher interpreted her comment as an unwarranted accusation of racism.

Later that same month, Dr. Burmeister met with Ferrill to discuss the issues we've just recounted and also to address the rapidly deteriorating morale at the school and numerous complaints from teachers about Ferrill's management style. In brief, Ferrill was described as confrontational, inconsistent in her treatment of the staff, and quick to suggest that others were either racist or culturally insensitive. Teachers lodged similar complaints about Ferrill with Katie Kelso, the teacher's union representative, and in December she too spoke with Ferrill about the growing problems stemming from her discordant leadership style.

An incident in January 2009 continued this trend. A black student accused a teacher of hitting her, and the school district launched an investigation into the incident. Although the matter was being handled at the district level, Ferrill conducted her own independent investigation, which

upset the teachers and staff, who thought that Ferrill was conducting her own investigation only because the student was black. It was widely believed that this extra layer of scrutiny would not have occurred had the student been white.

In the spring semester, Dr. Burmeister hired an outside consulting firm to help address the ongoing concerns about Ferrill's contentious management style. This intervention did not go well. The consultants reported that Ferrill resisted their efforts and faculty feared retaliation whenever they shared ideas that she might reject. The consultants frankly concluded that removing Ferrill was the only way to solve the ongoing strife. Around this same time, Kelso met with the entire teaching staff—twice—to address the still unresolved complaints about Ferrill.

At the close of the tumultuous 2008–2009 school year, Dr. Burmeister completed a year-end evaluation of Ferrill's performance. The evaluation listed her strengths and weaknesses in a few key categories. For example, the superintendent noted that Ferrill excelled at limiting the loss of instructional time but needed to improve her management techniques and interpersonal skills by (among other things) being more receptive and responsive to staff and parental concerns.

At the beginning of the 2009–2010 academic year, the district gave its employees a 3% cost-of-living raise. The pay bump came as a bit of a surprise because the district had frozen salaries. But with staff members retiring and new hires starting at lower salaries, the district lifted the pay freeze and instituted a uniform cost-of-living increase.

Also at the start of the new school year, Dr. Burmeister gave Ferrill a list of goals and objectives in an effort to improve her performance. The goals and objectives roughly tracked the issues the superintendent had identified in her year-end evaluation. At the top of the list was a requirement that Ferrill meet regularly with a mentor throughout the fall semester. Ferrill did so only four times before the mentor declared the effort futile and called it quits because Ferrill could not admit to any need to improve her job performance.

Another incident in November 2009 signaled the beginning of the end of Ferrill's tenure at Edgewood. Throughout the fall semester, a teacher had been requesting that a student teacher from Marquette University be placed in her classroom. It was the principal's responsibility to make the necessary arrangements with the university. Despite frequent reminders from the teacher, Ferrill did not follow up. When she finally contacted the university on November 18, she emailed the teacher advising that she would "stop down" to her classroom the next morning to discuss the matter. Ferrill never showed up. The teacher reported the no-show to the superintendent, who confronted Ferrill about her lack of follow-through.

On November 23 Dr. Burmeister met with Ferrill—this time with the human resources director in attendance—to address her continuing performance deficiencies. The meeting was tense, and when it wrapped up, the superintendent handed Ferrill a letter containing a detailed critique of her job performance.

On December 4 Dr. Burmeister gave Ferrill a formal performance-improvement plan covering the remainder of the

school year. The plan was largely derived from the year-end performance evaluation from the previous year and the goals-and-objectives plan from the beginning of the fall semester. There was not enough time to discuss the plan in detail that day, so they agreed to meet on January 7, 2010, to review it more thoroughly. When the meeting date came, Ferrill arrived with an attorney. The discussion did not go well. Ferrill wanted to talk about racial issues at the school. Indeed, her attorney said the real problem was that the white faculty members did not want to take direction from a black principal. Dr. Burmeister tried to keep the focus on the performance-improvement plan. Ferrill disagreed with the plan and took issue with its factual foundations.

Based on this impasse and the failure of earlier intervention efforts, positive change seemed unattainable. On January 11 Dr. Burmeister recommended that the Board opt out of Ferrill's contract rollover. The Board accepted the recommendation. A week later Ferrill sent a letter to the Board taking issue with the performance-review plan and raising various racial issues at Edgewood, laying the blame at the superintendent's doorstep. She also sent two detailed letters to Dr. Burmeister raising similar objections.

The superintendent interpreted Ferrill's letter to the Board as an act of insubordination. Nonetheless, the Board treated her accusations seriously. Ferrill was placed on paid administrative leave while her allegations were investigated. Dr. Burmeister was cleared of any wrongdoing, racial or otherwise. Later in the semester, Ferrill accepted a job with another school district, which the Board construed as a resignation. *See* WIS. STAT. § 118.24(6) (stating that an admin-

istrator cannot be under contract with two school boards simultaneously).

Ferrill then sued the school district and the Board. (We will refer to the defendants collectively as "the Board.") The suit alleged claims of racial discrimination in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*, and § 1981 arising from the Board's decision to place her on administrative leave and opting out of her contract rollover. She also alleged retaliation claims under Title VII based on the same two employment actions. Finally, she asserted a claim for retaliation in violation of her rights under the First Amendment.

The Board moved for summary judgment. The district judge granted the motion in part, holding that the evidence was insufficient to create a triable issue of fact on the discrimination and retaliation claims related to the Board's decision to opt out of Ferrill's contract rollover. The remaining claims were tried to a jury, which returned a verdict for the Board after just 20 minutes of deliberation.

## II. Analysis

Ferrill's appeal is limited to the judge's ruling on summary judgment that the evidentiary record was insufficient to warrant a trial on the discrimination and retaliation claims stemming from the Board's decision not to roll over her contract. We review that ruling de novo. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010).

"The legal analysis for discrimination claims under Title VII and § 1981 is identical, so we merge our discussion of the two claims." *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015). Last year we overruled a line of our cases separating discrimination claims into "direct" and

"indirect" categories and assigning different legal standards to each. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016). We clarified in *Ortiz* that *all* discrimination cases present the same basic legal inquiry: At the summary-judgment stage, the proper question to ask is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action." *Id.* at 765.

Nothing in *Ortiz*, however, displaced the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is sometimes referred to as the "indirect" method of proof. 834 F.3d at 766. (It's not our prerogative to displace a decision method established by the Supreme Court.) The *McDonnell Douglas* framework is just "a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence—evidence that similarly situated employees not in the plaintiff's protected class were treated better—would permit a jury to infer discriminatory intent." *Smith*, 806 F.3d at 905.

The parties and the district judge used the *McDonnell Douglas* burden-shifting method to analyze this case, so we'll do the same. This familiar framework requires the plaintiff to carry the burden of production on a four-part prima facie case. The plaintiff must first show that "(1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment." *Id.*; *see also Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff makes

this prima facie showing, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action. *Smith*, 806 F.3d at 905. If the employer does this, then the burden shifts back to the plaintiff to produce evidence establishing a genuine dispute of fact about whether the employer's reason was a pretext for discrimination. "Pretext" is more than a mere mistake; it "means a lie"—a "phony reason" for the employment action. *Id.* (quotation marks omitted).

The crux of this case is the second element of the prima facie case, which asks whether the plaintiff was meeting the employer's legitimate performance expectations. We agree with the district judge that Ferrill has not made the required showing. The uncontroverted evidence all points in one direction: Ferrill's job performance during her two years at Edgewood was fraught with problems and fell well below the district's legitimate expectations, creating serious erosion in morale at the school. Staff repeatedly complained that her management style was confrontational and inconsistent, and she was sometimes nonresponsive. She was prone to hostility toward opposing viewpoints and quick to intimate that those around her were racist. Importantly, these shortcomings were confirmed by the independent consulting firm that was brought in to evaluate the situation and help Ferrill improve. That effort bore no fruit; the consultants ultimately recommended that the only way to restore the school's deteriorating morale was to remove Ferrill.

Dr. Burmeister herself experienced Ferrill's resistance to improvement firsthand and over an extended period of time. She implemented essentially the same set of goals and objectives no fewer than three times during the course of

two school years and amid persistent friction between Ferrill and her subordinates. To no avail; there was no meaningful improvement. Ferrill admits that she simply disagreed with the substance of the improvement plans.

Ferrill's response is to argue that her year-end evaluation identified *some* areas in which she *was* meeting the district's expectations. True, but the superintendent's review also identified serious weaknesses in her job performance. A reasonable jury could not conclude, based on that evaluation alone, that Ferrill was performing up to standards. More to the point, Dr. Burmeister reiterated the weaknesses in Ferrill's performance throughout the 2009–2010 school year with no discernable improvement. The year-end review hardly establishes that she was meeting the district's legitimate expectations.

Equally faulty is Ferrill's argument that the 3% raise at the beginning of the 2009–2010 school year demonstrates that Dr. Burmeister thought she was meeting expectations. The record is unequivocal that this was a district-wide cost-of-living increase, so no conclusion about her performance can be drawn from it.

Finally, Ferrill argues that all of Dr. Burmeister's criticisms can be traced to racial issues at Edgewood. In short, she maintains that once she embarked on her effort to raise awareness of racism, the superintendent became intent on removing her no matter her performance. To support this theory, she points to what she calls the "suspicious timing" of her first meeting with Dr. Burmeister to discuss performance problems. That meeting, in November 2008, occurred soon after she drew attention to racially charged incidents at the school. There was no suspicious timing at

work here. The Board's decision to opt out of the rollover came *more than a year later*.

Even if we set aside the *McDonnell Douglas* framework and approach this case in the more straightforward way specified in *Ortiz*, summary judgment for the Board was appropriate. Undisputed evidence establishes that the Board decided to stop Ferrill's rollover because of her persistent resistance to improving her performance, which was well documented and confirmed by an independent consultant. On this record, a reasonable jury could not conclude that the Board took this action because of Ferrill's race.

Ferrill's claim for retaliation fares no better. A retaliation claim arises when an employee engages in activity protected by Title VII and suffers an adverse employment action as a result. *See Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016). The parties debate whether Ferrill has shown that she engaged in protected activity in the first place. "Protected activity" is "some step in opposition to a form of discrimination that the statute prohibits." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). It's not necessary that the employee opposed a practice that is *actually* prohibited by Title VII; the employee need only have a "good-faith and *reasonable* belief that he is opposing unlawful conduct." *Id.* (emphasis added).

A threshold difficulty is that Ferrill's efforts to raise awareness of racial issues at Edgewood focused almost entirely on behavior by *the students* and did not concern any employment practice by the school district. Student behavior falls outside the ambit of Title VII. *See Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1183 (8th Cir. 1998). That said, in her meeting with Dr. Burmeister on January 7,

2010, Ferrill did suggest—through her attorney—that white faculty members were reluctant to take direction from a black principal. Though this complaint is highly generalized and only tenuously connected to an employment practice by the district, we'll assume for the sake of argument that it's enough to qualify as opposition to a form of discrimination prohibited by Title VII.

Even with that generous assumption, Ferrill's claim fails for lack of evidence of causation. To prevail on a retaliation claim requires "proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). As we've explained, the evidence establishes beyond dispute that Dr. Burmeister's recommendation that the Board opt out of the contract rollover was motivated by Ferrill's persistent resistance to improving her performance, which spanned the entirety of her two-year tenure and was confirmed by an independent consultant. Ferrill asserts that Dr. Burmeister would not have taken this step but for a desire to retaliate against her for complaining about racism at the school. The record does not support that assertion.

AFFIRMED.